STATE of Missouri, Respondent,

v.

James CARTWRIGHT, Defendant–Appellant.

No. ED 76042.

Missouri Court of Appeals, Eastern District, Division Three.

April 18, 2000.

Craig A. Johnston, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Asst. Atty. Gen., Jefferson City, for respondent.

LAWRENCE E. MOONEY, Judge.

James Cartwright ("Defendant") appeals the judgment entered on his conviction of aggravated stalking in violation of Section 565.225 RSMo. (1994) [1]. On appeal, Defendant claims that the trial court erred in (1) overruling his motions for judgment of acquittal and in sentencing him on his aggra-

1. All future statutory citations are to RSMo. (1994) unless otherwise indicated.

vated stalking conviction because there was insufficient evidence to prove his guilt beyond a reasonable doubt in that the State did not prove that Defendant made a credible threat against the life of, or a credible threat to cause physical injury to, his wife, Laura Cartwright ("Victim"), or that Defendant intended to cause Victim to reasonably fear for her safety; and (2) overruling Defendant's motion for continuance, after the court allowed appointed counsel to withdraw and private counsel to enter her appearance just nine days before trial causing prejudice to Defendant because the State had just recently disclosed police reports and cassette tapes and private counsel had not been given adequate time to investigate, prepare, subpoena witnesses, or make considered and reasoned trial decisions. We affirm.

## FACTS

Viewed in light most favorable to the verdict, the facts adduced at trial are as follows: Defendant and Victim were married for seven years. The couple began having marital problems in August 1997 after Defendant accused Victim of having sexual relations with friends and co-workers. Defendant began to repeatedly waken Victim in the middle of the night accusing her of extramarital affairs and demanding that she confess. One night in August, Defendant told Victim that he was sick of the affairs and that he was "going to break [her] neck and...throw [her] down the basement stairs."

Defendant's accusations and threats were followed by apologies that somewhat settled Victim's fears. The accusations did not cease, however. One weekend, Victim's friend, Monica, was staying with the couple. Defendant told Victim he knew that Victim and Monica were sleeping together. He then said, "I'm going to sleep with both you and Monica...this has been my fantasy and you owe it to me." The two argued about the issue the next day, and Defendant repeatedly accused Victim of the affairs. Defendant then got a can of black spray paint and painted "fag" in letters three feet tall on the side of Victim's van. Victim fled to her parents' house with her children and called the police. The next day, she obtained an *ex parte* order of protection. By the terms of the order, Defendant could not harass Victim nor enter their home.

Defendant began parking across the street from Victim's house at night and sleeping in his truck. Defendant violated the terms of the order for the first time when he entered the house and stole jewelry while Victim was gone. The following day, Defendant was arrested for both violating the protective order and for felony stealing after he took a cellular phone out of Victim's van while it was parked in Victim's driveway. Defendant later made false reports about Victim to the Division of Family Services and to her manager at work, telling him that she was selling company secrets.

Victim filed for divorce on August 25, 1997. Appellant then inundated Victim with apologies, gifts, and excuses for his behavior blaming it on medication that he had been taking. However, the accusations began again after Victim had Debbie, a friend, stay with her for a weekend in September. Defendant, who was still sleeping in his truck across the street, called Victim and accused her of having an affair and said that he had videotaped her having sex with Debbie. Victim phoned the police again after Defendant entered the property in violation of the protection order. He left before the police arrived.

On another occasion, Defendant persuaded Victim to allow him to take a shower in the house. Victim waited with their son outside. The next day, Victim found three listening devices in the kitchen, her bedroom, and the spare bedroom. Victim obtained a full order of protection. Private investigators later found another recording device in the garage that was wired into the phone line and a tape of Victim's telephone conversations.

Later, Defendant's attorney arranged for Defendant to collect his things from the house. Victim left the house after Defendant did not arrive at the scheduled time. She returned home to find Defendant standing in the garage. Defendant said that the judge had told him he could get anything that he wanted out of the house and started ranting about Victim stealing his recorder that he had been using to tape her conversations. Victim called the police again, and Defendant fled before they arrived. Victim and her family discovered more recording devices after this incident.

In October and November, Defendant changed his strategy. He began following Victim to work, calling her on her cellular phone, and stopping his car in the middle of the road outside her workplace and repeatedly screaming "I love you!" Defendant also moved into an apartment building adjacent to Victim's house so that he could, "...go outside and scream [']I love you, Laura[']..."

According to court order, Victim and Defendant exchanged custody of their son at Victim's mother's residence. Defendant requested that Victim bring his guns to the next exchange. When Victim refused, Defendant said, "I can go in the City and get a gun for a hundred dollars." At another exchange, Defendant told Victim that when the divorce was final he would destroy everyone that had anything to do with the divorce and then kill himself. Victim later made a police report of the incident and arranged for officers to be present the next time she had to pick up her son from visitation. At the next visitation, Defendant walked up to Victim's car before the police arrived and pressed a piece of paper against her window that read, "I am the ax murderer. If you fuck with me one more time, I will kill you." The police arrived and told Victim to leave. Victim reported the incident to the police as soon as she arrived home.

Victim found Defendant in her basement the night after Christmas. She screamed, locked the door to the basement, ran out into the street with her phone and called the police. Defendant fled before the police arrived. Defendant had been in the house all night listening to Victim through a furnace vent. Later, Victim found one of her nightgowns in the basement. It had been shredded with a knife or razor. Police arrested Defendant shortly thereafter.

At trial, Defendant presented no evidence; and the jury found Defendant guilty of aggravated stalking. Defendant was sentenced to serve five months in the St. Charles County Jail. Defendant timely filed this appeal.

## ANALYSIS

### I.

### SUFFICIENCY OF THE EVIDENCE

■ In his first point on appeal, Defendant challenges the sufficiency of the evidence in support of his conviction for aggravated stalking. Specifically, Defendant argues that the State did not adduce sufficient evidence to support the jury's finding that Defendant made a credible threat against the life of Victim or to cause physical injury to Victim or that Defendant acted with the intent to place Victim in reasonable fear of death or serious physical injury.

■ This Court does not act as a super juror with veto powers when reviewing the sufficiency of the evidence to support a criminal conviction. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998) *cert. denied*, 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998). In fact, we owe great deference to the trier of fact. *Id.* We do not ask ourselves whether we believe that the evidence at trial established guilt beyond a reasonable doubt. *Id.* Rather, we ask whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Applying this analysis to the case at bar, we

find that a rational trier of fact could have found Defendant guilty of aggravated stalking beyond a reasonable doubt.

"Any person who purposely and repeatedly harasses or follows with the intent of harassing or harasses another person, and makes a credible threat with the intent to place that person in reasonable fear of death or serious physical injury, commits the crime of aggravated stalking." Section 565.225. For purposes of this statute, a "credible threat" is a threat "made with the intent to cause the person who is the target of the threat to reasonably fear for his or her safety. The threat must be against the life of, or a threat to cause physical injury to, a person..." *Id.*

In a Bill of Particulars, the State alleged three specific incidents in which Defendant made credible threats to Victim. The first incident occurred in August 1997 when Defendant threatened to throw Victim down the stairs and break her neck ("August occurrence"). Second, the state identified the December 10th confrontation in which Defendant stated that if the divorce went through, he would "destroy" everyone involved and then kill himself ("December 10[th] occurrence"). Finally, the State pointed to the December 14th custody exchange when Defendant showed Victim the letter reading, "I am the ax murderer. If you fuck with me one more time I will kill you," ("December 14[th] occurrence").

Regarding the December 14th and August occurrences, Defendant argues that his actions did not cause Victim to reasonably fear for her safety as evidenced by the fact that she either did not call the police immediately or at all. Defendant also argues that the December 10th occurrence does not rise to the level of a credible threat because the word "destroy" is too nebulous to satisfy the requirement that there be a credible threat against the life or safety of Victim. We disagree.

■ Whether Defendant had the requisite intent to cause Victim to reasonably fear for her safety does not depend upon Victim's later actions as Defendant argues. A reasonable juror could find that any of the three occurrences constituted a threat made with the intent to place Victim in reasonable fear for her safety. All of the communications involved words like "kill" and "destroy" that are frequently associated with severe physical harm. Likewise, a reasonable juror could have found that Victim was reasonably fearful for her safety. Victim repeatedly testified that she was "afraid he was going to kill me," "scared," that she believed what he told her, that she had trouble sleeping and eating, that she had nightmares, and that everyday she woke up wondering if it would be the day that Defendant killed her.

Thus, viewing the facts most favorably to the prosecution, we find that a reasonable juror could have found Defendant guilty of making credible threats against the life or safety of Victim. Defendant's first point is denied.

## II.

### CONTINUANCE

■ In his second point on appeal, Defendant claims the trial court abused its discretion in overruling Defendant's motion for continuance after the court allowed appointed counsel to withdraw nine days before trial. Defendant claims that the denial of the continuance prejudiced him because private counsel Glass was not given adequate time to investigate, prepare, subpoena witnesses, or make considered and reasoned trial decisions. Additionally, Defendant claims that Glass did not have adequate time to review newly disclosed police reports and cassette tapes. We disagree.

■ The only claim of prejudice preserved for appeal involves the lack of time to review the newly disclosed police reports and cassette tapes. Defendant did not raise the issue of his counsel's time to investigate, prepare, subpoena witnesses,

**154**

or make considered and reasoned trial decisions in either his written motion for continuance or in his motion for a new trial. Allegations of error cannot be broadened or changed on appeal. *State v. Pospeshil*, 674 S.W.2d 628, 632 (Mo.App. S.D.1984). Accordingly, these latter claims of error are only subject to plain error review.

 The preserved claim of error arises out of the trial court's failure to grant a continuance after an alleged discovery violation by the State. Defendant claims that his counsel was given inadequate time to review certain police reports and cassette tapes that the State produced on the morning of trial. In order to remedy such a violation, the trial court "may order such party to make disclosure of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other orders as it deems just and proper." Rule 25.16. When the State fails to make timely disclosure, the remedy is left to the sound discretion of the trial court. *State v. Kinder*, 942 S.W.2d 313, 322 (Mo. banc 1991). We will intervene only where a defendant demonstrates that the State's failure to timely disclose results in fundamental unfairness. *Id.* Defendant fails to meet this standard.

Here, the trial court allowed Defendant to review the evidence over a recess prior to the prosecution's case. A recess is a valid remedy for a discovery violation. *State v. Carlisle*, 995 S.W.2d 518, 521 (Mo.App. E.D.1999). Not only was Defendant given adequate time to review the information, Defendant also had previous notice of the information since both the police reports and tapes were referred to in Victim's pretrial deposition. Accordingly, we find that the trial court did not abuse its discretion in refusing to grant a continuance in order to remedy an alleged discovery violation.

Turning to the unpreserved claims, Defendant must show that the trial court's failure to grant the continuance for reasons not then argued before the court not only resulted in prejudicial error, but that the error affected his rights so substantially that manifest injustice or a miscarriage of justice resulted. *State v. Davis*, 825 S.W.2d 948, 952 (Mo.App. E.D. 1992). No manifest injustice has occurred here.

Defendant suffers only from his own actions, not the court's. Defendant created the situation of which he complains by changing attorneys nine days before trial. The trial court is not required to grant a continuance when the Defendant voluntarily obtains private counsel on the eve of trial, nor is the court obligated to force appointed counsel to assist the new counsel. *State v. Crider*, 451 S.W.2d 825, 827 (Mo.1970). Accordingly, the trial court did not plainly err.

Finding no merit in any of Defendant's claims of error, the judgment of the trial court is affirmed.

RICHARD B. TEITELMAN, P.J., and CLIFFORD H. AHRENS, J., concur.