**STATE of Missouri, Respondent,**

v.

**Donnie F. DISMANG, Appellant.**

**No. 26195.**

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 22, 2004.

Rosalynn Koch, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Appellant, Donnie F. Dismang ("Defendant"), was convicted by a Greene County jury of two counts of domestic assault in the first degree, section 565.072; two counts of domestic assault in the second degree, section 565.073; and, one count of armed criminal action, section 571.015.[1] The trial court sentenced Defendant as a prior and persistent offender to concurrent twenty-five year terms of imprisonment for each conviction of domestic assault in

1. Unless otherwise stated, all statutory references are to RSMo 2000.

the first degree; concurrent terms of ten years imprisonment for each count of domestic assault in the second degree; and a fifteen year term of imprisonment for the conviction of armed criminal action, to run consecutive to the other terms of imprisonment.

Defendant raises four points in his appeal, discussed below. We affirm.

■ As a general rule, we review the evidence and all reasonable inferences in a light most favorable to the verdict and will disregard any evidence and inferences to the contrary. *State v. Dewitt*, 924 S.W.2d 568, 570 (Mo.App.1996).

In March of 2002, Defendant lived with his girlfriend, Tonya Eagleson ("Victim"), and her two-year-old son, Mikey, in a building containing two apartments located on West Mt. Vernon Street in Springfield. The couple lived in the second-story apartment while their friend, Lisa Cowens, and her twelve-year-old son, Randy, lived in the unit below. On the night of March 2, 2002, Defendant and Victim went to Lisa's apartment to party with Lisa and her friend, Bob. Randy was present but Mikey was asleep in the unit upstairs. The adults were drinking alcohol. Late in the evening, the group had consumed all the alcohol Lisa and Victim had purchased earlier in the day, which consisted of two bottles of Cisco and one of "hard liquor." Victim and Lisa's friend left the apartment to buy some more. On their return, Victim returned to find Defendant angry and ready to "fight somebody." Victim calmed Defendant down; he and Lisa then resumed drinking. Later, when Victim discovered Defendant and Lisa in the living room kissing, she stormed out and went upstairs to her apartment. Defendant pursued Victim up the stairs and, finding the door locked, broke the door down. He then rushed in and told Victim she couldn't leave him, and began smashing her head against the wooden arm of the couch on which she was sitting. Holding Victim by the hair, he banged her head repeatedly on the couch arm and punched her in the face. When Defendant stopped, Victim started back toward her son's room in order to take the boy and leave. Defendant followed her, grabbed her arms, threw her on the floor of the boy's room and choked her repeatedly. Victim lost consciousness briefly, blacking out during one of the choking incidents. While Victim was still on the floor, Defendant kicked her in the ribs and the back, hit her across the legs with the child's rollerblades, and even bit her on the back.

Victim noticed Mikey sit up in bed and not wanting the child to see her being beaten, Victim got up and headed toward the bathroom. Defendant followed, pushing Victim down the hallway to the bathroom. Once there, Defendant forced Victim to the floor where she hit her head on the toilet bowl rim. With her head still against the rim, he grabbed the toilet seat and smashed it down repeatedly on her head. Defendant let Victim rise, dragged her to the kitchen to get a knife, then dragged her back to the bathroom, where he put the knife to her throat and threatened to kill her. Victim struggled with Defendant and pulled the knife away from her throat. Defendant then grabbed the knife out of her hand and stabbed her in the lower left arm. The knife completely penetrated the left arm and the tip of the knife was visible on the other side. Both Victim and Defendant sustained small cuts on their hands in the struggle. At one point, while in the bathroom, Defendant showed Victim her reflection in the mirror and said, "Look what you've done."

Victim's knife wound bled profusely. Victim told Defendant that she needed to go to the hospital for stitches; Defendant allowed her to go down to Lisa's apart-

ment to call 911 because they had no phone in their unit, however, he warned her not to tell the police he was responsible for the injuries or he would kill her and her family.

Defendant followed Victim down to Lisa's residence. Randy answered the door and called 911 for Victim; Defendant was present when the emergency call was placed.

At 3:44 a.m., Springfield Police Officer Tonya Price responded to the call, which originally indicated only that a female had been assaulted and cut with a knife. Paramedics were already on the scene when the officer arrived. Officer Price followed the ambulance to the hospital to interview Victim and to aid the major crimes investigator in taking photographs of Victim's injuries. At the hospital, Victim told the officer and hospital staff a fabricated account of being attacked outside of the "Juke Joint" on the square [at Pershing Street and South Avenue] by "some girls." Victim mentioned that she had been wearing a sweatshirt at the time of the attack and that it was back at the apartment.

Officer Price had some reservations about Victim's story and returned to the apartment to speak with Defendant and find the sweatshirt. Defendant was incoherent but cooperative as he allowed the officer to look through the apartment. There, Officer Price found the sweatshirt, which had a large amount of blood on it. Officer Price then looked for signs of a struggle. In the bathroom, she saw what appeared to be blood on the wall, around the sink area, and in the toilet stool. When Officer Price noticed blood on Defendant's socks, and asked him where it came from, he replied that he had been in the downstairs apartment when Victim arrived after the assault and she had bled on him. Officer Price then went down to Lisa's apartment and spoke with Randy

about the incident. Afterward, Officer Price drove to the alleged scene of the assault, where she found no evidence of blood or even that a struggle had taken place.

Victim was admitted to the hospital because she had sustained a closed-head injury in the assault. While she was there, Defendant visited her and made fun of how big her lips were. He also warned her repeatedly not to tell anyone that he had beaten her. Victim was released from the hospital after three days and returned to her apartment, where Defendant had remained.

The day after she returned home, Victim and Defendant were called in to the Greene County Juvenile Office to discuss what had happened to Victim and what was going to happen to Mikey. While they were there, the juvenile authorities discovered there were arrest warrants pending for both of them based on a charge of forgery. They were subsequently arrested and taken to jail. After three days, Victim was bonded out by a family member. Defendant, however, remained incarcerated.

When Victim returned home, she called 911 from Lisa's apartment, admitting that she had previously filed a false police report and stating that it was actually Defendant who had assaulted her. Officer Mark Foos was dispatched to the scene, where he interviewed Victim briefly. He and the police photographer took pictures of the upstairs apartment and Victim, noting her many, still visible injuries.

At trial, Officer Foos testified there were several places in the apartment where he saw what appeared to be blood, including in the bathroom, on a rolled-up piece of carpet, and on the wall in Mikey's bedroom. The officer took Victim's sweatshirt and a knife with him as evidence.

On March 8, while still incarcerated in the Greene County jail, Defendant agreed to be interviewed about the assault. During the interview he told the investigator that, on March 2, he and Victim had been socializing in the apartment below with friends; that he had been drinking alcohol and taking pills; and, because of his ingestion of intoxicants, he couldn't remember what happened after he left the apartment. However, he admitted that he discussed the beating with Victim when he visited her in the hospital; that Victim "told him [what] he had done to her," and he apologized to her. During the interview Defendant cried and sobbed, and asked the detective what he could do to make it up to Victim. He begged him to tell her that he was "terribly sorry." [2]

■ In his first point, Defendant asserts the "trial court abused its discretion in admitting, over his objections, Exhibit Number 100, which purported to be [Defendant's] prior Kentucky conviction, and in relying on such record to find [Defendant] to be a prior and persistent offender under § 577.023 . . . ." Defendant contends that admitting the exhibit was error because it was not properly authenticated or attested to in accordance with section 490.130, and, thus, not entitled to full faith and credit by the trial court, nor admissible as evidence.[3]

We note that during a pre-trial conference, in addition to Exhibit 100, the State also offered Exhibits 101 and 102 in order to prove Defendant to be a prior and persistent offender.

Exhibit 101 contained, *inter alia,* a "judgment of sentence" which recited a Michigan conviction of felony child abuse in the third degree. The exhibit was accompanied by the attestation of the clerk and certification of the judge, which verified that the clerk's attestation was in proper form and his signature was genuine, in compliance with section 490.130.

The final exhibit, Exhibit 102, was the penitentiary pack ("pen pack") from the State of Michigan's Department of Corrections, which correlated with the offense described in Exhibit 101. This "pen pack" also contained information relating to Defendant's prior convictions, including five additional, out-of-state felony convictions and attendant sentences of imprisonment. Defense counsel objected to all three exhibits setting out that while defense counsel was not familiar with the certification requirements for out-of-state documents, she, nevertheless, wanted to preserve a "general objection" to the form of the exhibits.

The trial court received the three exhibits into evidence and determined, "based on all three exhibits," that Defendant was a prior and persistent offender beyond a reasonable doubt.

■ A trial court is vested with broad discretion as to what evidence it permits and we will reverse only if the trial court has clearly abused its discretion. *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998). A trial court abuses its discretion only when the decision is clearly against the logic of the circumstances and "is so

2. Additional facts pertaining to Defendant's points on appeal will be discussed during our analysis of the law and facts.

3. Section 490.130 reads in pertinent part:
 The records of judicial proceedings of any court of the United States, or of any state, attested by the clerk thereof, with the seal of the court annexed, if there be a seal, and certified by the judge, chief justice or presiding associate circuit judge of the court to be attested in due form, shall have such faith and credit given to them in this state as they would have at the place whence the said records come.

unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Hancock v. Shook*, 100 S.W.3d 786, 795 (Mo. banc 2003). On direct appeal, this Court will review the trial court's determination not for mere error, but for prejudice and will reverse the conviction only if the error is so prejudicial as to deprive the defendant of a fair trial. *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996).

■ Defendant argues that Exhibit 100, an out-of-state court document from Kentucky, was not properly authenticated under section 490.130, and was not entitled to full faith and credit in the trial court. *See* fn. 3. "When prior convictions are the basis for enhanced punishment or procedural differences, the state must prove the fact of prior convictions and do so in conformity with applicable statutory requirements for such proof." *State v. Monroe*, 18 S.W.3d 455, 458 (Mo.App.2000).

While State's Exhibit 100 bears a certification of the court clerk on each page, including the three pages pertaining to the "Judgment of Conviction and Sentence" of Defendant for five felonies, the exhibit, nevertheless, lacked certification by a judge that the copies had been attested by the clerk in due form in compliance with section 490.130. Accordingly, Exhibit 100 did not meet the requirements of section 490.130, and should not have been accorded full faith and credit in the trial court as evidence of Defendant's prior felony convictions. *Monroe*, 18 S.W.3d at 458. The trial court, therefore, erred by admitting, over timely objection, Exhibit 100 which had not been properly authenticated. *Id.*

■ We observe, nevertheless, that in matters involving the proper admission of evidence, Defendant must show not only error but also that he was prejudiced by the admission of the evidence in question. *See generally State v. Hayes*, 113 S.W.3d 222, 226 (Mo.App.2003). In the instant case, Defendant was not prejudiced by this error because the "pen pack," contained in Exhibit 102, was properly certified under seal by the "Central Records Department Supervisor [of the] Michigan Department of Corrections" in accordance with section 490.220, which governs the receipt into evidence of "records and exemplifications of office books, kept in any public office of the United States, or a sister state, not appertaining to a court. . . ." § 490.220.[4] Exhibit 102 set out, *inter alia*, Defendant's prior criminal history of five felony convictions outside of the State of Michigan. Under similar circumstances in *State v. Donehue*, 145 S.W.3d 475 (Mo.App.2004), this Court affirmed the trial court's classification of the *Donehue* defendant as a prior and persistent offender, based on certified out-of-state prison records which "appear[ed] to have been certified pursuant to Section 490.220. . . ." *Id.* at 478 n.6. Point denied.

■ In his second point, Defendant contends the trial court erred in sustaining the State's objection to the defense's attempt to cross-examine Officer Price regarding specifics of Victim's statements to Officer Price about the "girls-on-the-square" story. Defendant asserts this line of questioning was relevant because it supported his theory that Victim was, in fact, injured in an attack on the square, and she only changed her story later when encouraged by her friend, Lisa.

4. Section 490.220 reads:
All records and exemplifications of office books, kept in any public office of the United States, or of a sister state, not appertaining to a court, shall be evidence in this state, if attested by the keeper of said record or books, and the seal of his office, if there be a seal.

At trial, the State objected on the grounds of improper impeachment, when defense attempted to question Officer Price about details Victim had told her about the assault. Outside the presence of the jury, defense counsel explained that she wanted to show in detail what Victim had told Officer Price regarding what the attackers had looked like and what they said.

The trial court sustained the State's objection, stating that defense counsel could have questioned Victim during cross-examination about her statements to Officer Price, but had not availed herself of that opportunity. A lengthy and convoluted discussion followed, during which defense counsel argued several different reasons why the testimony should be allowed, including: as an exception to hearsay (not being offered for the truth of the matter, but asserted merely to prove the statements were made); and to show that the officer failed to follow-up on the case.

On appeal, Defendant maintains Victim's statements to Officer Price should have been admitted under section 491.074, as prior inconsistent statements. However, we note that although defense counsel at trial argued several theories as to why Victim's statements should be admissible, she never once contended that they were prior inconsistent statements. In fact she stated, "I understand that it's not necessarily a prior inconsistent statement. . . ."

An argument is not properly preserved for appeal when the Appellant fails to argue at trial the grounds asserted upon appeal. *See State v. Tisius*, 92 S.W.3d 751, 767 (Mo. banc 2002). An appellant cannot broaden or change allegations of error on appeal; therefore this claim of error is subject only to plain error review. *State v. Cartwright*, 17 S.W.3d 149, 154 (Mo.App.2000).

The "plain error" rule should be used sparingly and must not be used to justify review of every point not otherwise preserved for appellate review. *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997). The burden of proving that a "manifest injustice or a miscarriage of justice" will occur in the absence of plain error review rests on the appellant. *Id.*; Rule 30.20.[5] Unless the claim of plain error clearly establishes substantial grounds for believing a miscarriage of justice has resulted, the court will decline to exercise its discretion to review for plain error. *Roberts*, 948 S.W.2d at 592.

Here, Defendant appears to complain of an error largely of his own making. *See Cartwright*, 17 S.W.3d at 154. Defense counsel could have asked Victim on cross-examination the very same questions she sought to solicit on cross-examination of Officer Price.[6] The physical facts supported Victim's claim that Defendant had assaulted her, further evidenced by signs of blood in various parts of the apartment. Victim's initial story that unknown girls had attacked her at the square was not supported by physical evidence. Lastly, the record reveals the virtual admission by

---

5. All rule references are to the Missouri Court Rules (2004).

6. The jury was made perfectly aware of Victim's change in her recital to police as to who had assaulted her. We note that Victim testified on direct examination that (1) she told the 911 operator she had been accosted by the square at the "Juke Joint;" (2) Victim acknowledged she had previously told police at the hospital she had been jumped at the square; (3) Victim also stated that even after she was released from the hospital, she continued to maintain she had been attacked by some people down at the square; and, (4) Victim set out that after bonding out of jail, where she had been incarcerated on forgery charges, she called police to inform them that she had previously filed a false police report.

Defendant of the criminality of his acts, when he told Detective Haefling he was "terribly sorry" and that he would do "anything in the world to make it right." We are not convinced that under these circumstances Defendant has suffered such a manifest injustice or miscarriage of justice as to warrant plain error review. Point II is denied.

 In his third point, Defendant maintains the trial court erred in sustaining the State's objection to Defendant's closing argument pertaining to Victim having changed her story only after a juvenile hearing was set to determine her son's "juvenile status." Defendant contends he should have been allowed to make the argument because it was supported by the evidence.

At trial, Victim testified that the day after she was released from the hospital, she and Defendant "had to go to the juvenile office" to discuss "what happened to me and what was going to happen to Michael [Victim's son]." On cross-examination, Victim related that the conference had been set up to "discuss Mikey" and that there was to be "a hearing set for next Monday."

During closing arguments, defense counsel argued: "The next morning they have to go to the juvenile office. *There are questions about Tonya's son and there's a hearing set for the following Monday regarding her son.*" (Emphasis added.) The prosecutor objected, stating that was not a matter of evidence. The objection was sustained.

Defendant contends there was sufficient evidence in the record to support his argument, while the State counters that the closing argument was not *entirely* supported by the evidence, because there was no evidence of the first half of the statement, that there were "questions" about "Victim's son's status."

 This Court will review a trial court's ruling on a closing argument only for an abuse of discretion. *State v. Davis,* 126 S.W.3d 398, 400 (Mo.App.2004). This discretion is abused when a ruling is clearly against the logic of the circumstances then before the trial court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Brown,* 939 S.W.2d 882, 883 (Mo. banc 1997). If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.* at 883. Error is reversible only when it constitutes both an abuse of discretion by the trial court and prejudices the defendant. *Id.* at 883–84. "A party may argue inferences justified by the evidence, but not inferences unsupported by the facts." *State v. Barton,* 936 S.W.2d 781, 783 (Mo. banc 1996).

Defendant claims he was deprived of his right to a fair trial because, by excluding the statement, he could not present evidence of a possible motive for Victim to change her story and implicate him. There is, however, little or no evidence in the record as to any "questions" or *specific* issues regarding Victim's son. The only evidence was that the meeting was *about* Victim's son.

In either event, it seems clear that even if the trial court was incorrect about whether the statement was in evidence, the error was not prejudicial to Defendant in view of the overwhelming physical evidence which corroborated Victim's charges that Defendant had assaulted her. *See* parallel discussion in *State v. Beatty,* 617 S.W.2d 87, 92–93 (Mo.App.1981). As previously related, there was blood throughout Victim's apartment: in the bathroom; her child's bedroom; the front door of the

apartment was damaged (corroborating Victim's assertions Defendant violently crashed through the door); there was no sign of blood or other signs of an assault in the area where Victim had initially claimed she was assaulted. Point III is denied.

■■■ In his final point, Defendant argues the trial court erred in submitting Jury Instruction Numbers Five and Eight because they failed to follow the pattern instructions as designated by MAI–CR3d 319.73.[7] Rather than including this definition of "serious physical injury" in the instructions themselves, as required, the definition was placed in a separate instruction located toward the end of the instruction pack. Defendant contends that by doing so, the jury could have failed to understand the concept of "serious physical injury," allowing them to convict upon finding a lesser degree of injury.

During the instruction conference, defense counsel objected to Jury Instructions Five and Eight because they did not contain a paragraph defining "serious physical injury," as directed by the Missouri Approved Instructions. The State contended that the MAI–CR3d allowed for the definitions to be listed in a separate instruction, when used in more than one instruction. *See* MAI–CR3d 319.74, Notes on Use 7. A separate instructions page with a definition of "serious physical injury" was included as Jury Instruction Number Twenty–Two. The trial court agreed with the State.

During closing argument, the prosecution pointed out that some of the crimes Defendant was charged with required "serious physical injury," while others simply required "physical injury." In addition, the State also specifically directed the jury to look at Jury Instruction Number Twenty–Two, stating, "One thing you'll notice when you get your packet is at the end of all the verdict directors there's a page that gives you three definitions."

■■■ On a claim of instructional error, this Court will reverse only if there is both error in submitting an instruction and resulting prejudice to the defendant. *State v. Taylor*, 134 S.W.3d 21, 25 (Mo. banc 2004). Any deviation from the approved instructions shall constitute error and its prejudicial effect must be "judicially determined by considering the facts and instructions together." *State v. Thomas*, 75 S.W.3d 788, 791 (Mo.App.2002); *see* Rule 28.02(f).[8] When used in connection with assessing erroneous jury instructions, "prejudice" is the potential for confusing or misleading the jury. *State v. Sours*, 946 S.W.2d 747, 750 (Mo.App.1997).

From the record, it appears Defendant was not prejudiced by the erroneous jury instructions, because there was little potential for confusing or misleading of the jury. *Id.* The definition of "serious physical injury" was included in a jury instruction, albeit in a separate instruction. The

7. MAI–CR3d 319.73, reads, in pertinent part: "As used in this instruction, the term 'serious physical injury' means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body."
We note that in his brief, Defendant indicated that the instructions submitted in error were numbers Seven and Nine, rather than Five and Eight, the instructions actually objected

to during the instruction conference. This disparity was noted in the State's brief and corrected in Defendant's reply brief.

8. Rule 28.02(f) reads in pertinent part:
[t]he giving or failure to give an instruction or verdict form in violation of this Rule 28.02 or any applicable Notes On Use shall constitute error, the error's prejudicial effect to be judicially determined. . . .

State also called the jury's attention to the definitions instruction and reminded them that there was a difference between "serious physical injury" and "physical injury." Although the trial court erred in submitting Jury Instructions Five and Eight, "[e]rror alone, however, is not sufficient to require a reversal and remand." *Id.* Given these circumstances, we are not persuaded that Defendant was prejudiced. *See State v. Stoer,* 862 S.W.2d 348, 351 (Mo.App. 1993). Defendant's final point is denied.

The judgment is affirmed.

PARRISH, P.J., and SHRUM, J., concur.