Donnie Fidelis DISMANG,
Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

No. 27680.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 29, 2006.

Mark A. Grothoff, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, and Dora A. Fichter, Assistant Attorney General, Jefferson City, MO, for respondent.

GARY W. LYNCH, Judge.

Donnie Fidelis Dismang ("Movant") was found guilty by a jury on two counts of domestic assault in the first degree (§ 565.072[1]); two counts of domestic assault in the second degree (§ 565.073); and one count of armed criminal action (§ 571.015). The trial court sentenced Movant as a prior and persistent offender to concurrent twenty-five-year terms of imprisonment for each conviction of domestic assault in the first degree, concurrent terms of ten years' imprisonment for each count of domestic assault in the second degree, and a fifteen-year term of imprisonment for armed criminal action to run consecutive to the other terms of imprisonment. This Court affirmed Movant's conviction and sentence in *State v. Dismang*, 151 S.W.3d 155 (Mo.App.2004). Movant thereafter filed a Rule 29.15[2] motion for post-conviction relief which the motion court denied without an evidentiary hearing. Movant appeals, claiming the motion court erred in failing to hold an evidentiary hearing. We affirm.

### *(1) Factual and Procedural Background*

For a detailed account of the facts underlying Movant's convictions, see *Dismang, supra*. We borrow freely from these previously published details and include additional facts as necessary for analysis in this appeal.

In March of 2002, Movant lived with his girlfriend, Tonya Eagleson ("Victim"), and her two-year-old son, Mikey. The couple lived in a second-story apartment, and their friend, Lisa Cowens ("Cowens"), occupied the unit below with her son, Randy. On March 2, 2002, Movant, Victim and Cowens were socializing in Cowens' apartment along with Cowens' friend, Bob. Mikey was asleep in the unit upstairs. All four adults were consuming alcohol. After returning from purchasing more alcohol, Victim found Movant angry and ready to "fight somebody." Some time later, Victim discovered Movant and Cowens in the living room kissing, and she retreated to her apartment upstairs. Movant followed Victim and kicked in the door to the apartment after Victim locked it behind her. Movant rushed into the apartment and began smashing Victim's head against the wooden arm of the couch on which she was sitting. Movant held Victim by her hair, banged her head repeatedly on the couch, and also punched her in the face. Movant relented momentarily, and Victim headed toward her son's room to retrieve the child and leave. Movant followed Victim, grabbed her arms, threw her on the floor of her son's room, and choked her repeatedly. Victim lost consciousness briefly, blacking out during one of the choking incidents. While Victim was still on the floor, Movant kicked her in the ribs and

---

1. References to statutes are to RSMo 2000, unless otherwise indicated.

2. References to rules are to Missouri Court Rules (2006), unless otherwise indicated.

the back, hit her across the legs with her son's rollerblades, and bit her back.

Victim left her son's bedroom and headed toward the bathroom, followed by Movant. Movant forced Victim to the floor of the bathroom and began to smash the toilet seat on her head. Movant dragged Victim to the kitchen to get a knife, and then dragged her back to the bathroom, where he put the knife to her throat and threatened to kill her. Victim struggled with Movant and pulled the knife away from her throat. Movant then grabbed the knife out of her hand and stabbed her in the lower left arm. The knife completely penetrated the left arm, and the tip of the knife was visible on the other side. Movant showed Victim her reflection in the mirror and said, "Look what you've done."

The knife wound bled profusely. Victim told Movant that she needed to go to the hospital for stitches, and Movant allowed her to go to Cowens' apartment to use the phone. Movant however, warned Victim not to tell the police he was responsible for the injuries or he would kill her and her family. Movant went with Victim while she placed the call to 911.

At 3:44 a.m., Springfield police officer Tonya Price ("Officer Price") responded to the 911 call, which originally indicated only that a female had been assaulted and cut with a knife. Paramedics were already on the scene when the officer arrived. Officer Price followed the ambulance to the hospital to interview Victim. At the hospital, Victim told the officer and hospital staff a fabricated account of being attacked outside of the Juke Joint on the square by "some girls." Victim also said that she had been wearing a sweatshirt at the time of the attack and that it was at her apartment.

Office Price had some reservations about Victim's story and returned to the apartment to speak with Movant and obtain the sweatshirt. Movant was incoherent but cooperative as he allowed the officer to look around the apartment. Officer Price found the sweatshirt, which was covered in blood. Officer Price also observed blood on the wall, around the sink, and in the toilet of the bathroom. Officer Price noticed blood on Movant's socks and asked him where it came from. Movant told the officer that when Victim arrived after the assault, she had bled on him. Officer Price also interviewed Cowens and her son with regard to the incident. After leaving the apartment, Officer Price drove down by the Juke Joint but found no evidence of blood or signs of a struggle.

Victim was admitted to the hospital because she had sustained a closed-head injury in the assault. Movant visited her in the hospital and made fun of how big her lips were. He also warned her repeatedly not to tell anyone that he had beaten her. Victim was released from the hospital after three days and returned to the apartment she shared with Movant.

The day after her release, Victim and Movant were called in to the Greene County Juvenile Office to discuss what had happened to Victim and what was going to happen to her son. While there, the juvenile authorities discovered there were arrest warrants pending for both of them based on a charge of forgery, and the two were arrested and taken to jail. After three days, Victim bonded out of jail while Movant remained incarcerated.

When Victim returned home, she phoned 911 from Cowens' apartment and confessed that she had filed a false police report regarding her assault and stated that she was actually assaulted by Movant. Officer Mark Foos arrived and interviewed Victim. He also examined the apartment.

On March 8, while still incarcerated, Movant agreed to be interviewed on videotape by Detective Steve Haefling ("Detec-

tive Haefling") in regard to the assault. During the interview, Movant told the investigator that on March 2, he and Victim had been socializing in the apartment below with friends; that he had been drinking alcohol and taking pills; and, because of his ingestion of intoxicants, he couldn't remember what happened. However, he admitted that he discussed the beating with Victim when he visited her in the hospital, that Victim "told him [what] he had done to her," and that he apologized to her. During the interview, Movant cried and sobbed and asked the detective what he could do to make it up to Victim.

During the jury trial on the underlying charges, Victim testified to the above events. Victim was extensively cross-examined by Movant's trial counsel who spent the greater part of the cross examination attempting to impeach Victim's testimony and her character.

Officer Price testified about her interview with Victim and her observations. During Officer Price's cross-examination, Movant's trial counsel attempted to elicit in greater detail what Victim had initially reported to the officer regarding the phony report of an assault in front of the Juke Joint. The State objected, claiming hearsay and improper impeachment. The defense argued that the details were important to show that Victim couldn't have sustained any major head injuries, as her thinking was clear immediately following the assault, and that the evidence was not hearsay because it was not offered for the truth of the matter and it was necessary to impeach. The trial court disagreed with the defense and sustained the objection. This Court upheld the trial court's ruling on direct appeal, noting: "[Movant] appears to complain of an error largely of his own making.... Defense counsel could have asked Victim on cross-examination the very same questions she sought to solicit on cross-examination of Officer Price." *Dismang*, 151 S.W.3d at 162.

The State also offered the videotape of Detective Haefling's interview of Movant into evidence. However, before showing it to the jury, the State advised the trial court that it had recently redacted the tape to eliminate portions of the interview which the State deemed objectionable. During a recess, Movant's trial counsel was given an opportunity to view the tape. Following this review and consultation between the State and counsel for Movant, several further redactions were made to the videotape at the request of Movant's trial counsel. After the proceedings resumed, Movant's counsel stated to the trial court that the defense had no objection to the admission of the redacted videotape into evidence, and it was played for the jury.

Following affirmation of his convictions and sentence, Movant filed a *pro se* motion to vacate, set aside, or correct his judgment or sentence. Counsel was appointed, and an amended motion was filed. In his amended motion, Movant asserted that he was denied effective assistance of counsel in two respects: first, Movant argued that his trial counsel failed to adequately question Victim at trial concerning her statement to Officer Price; and second, in that trial counsel failed to adequately redact Movant's videotaped statement to police before it was played for the jury.

The motion court issued findings of fact and conclusions of law denying Movant's motion for post-conviction relief without holding an evidentiary hearing. This appeal followed.

*(2) Standard of Review*

Appellate review of a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous.

Rule 29.15(j). The findings, conclusions, and judgment of the motion court are clearly erroneous if a review of the entire record leaves this Court with a definite and firm impression that a mistake has been made. *State v. Thompson*, 835 S.W.2d 394, 400 (Mo.App.1992).

### (3) Entitlement to an Evidentiary Hearing

Movant is entitled to an evidentiary hearing only if: (1) his Rule 29.15 motion alleges facts, not conclusions, warranting relief; (2) those facts raise matters unrefuted by the record; and (3) the matters complained of resulted in prejudice to the Movant. *Id.* No evidentiary hearing is necessary if the files and record of the case conclusively show that Movant is not entitled to relief. Rule 29.15(h).

### (4) Point I—Denial of Evidentiary Hearing on Allegation of Counsel's Failure to Adequately Cross-examine Victim

■ In his first point on appeal, Movant argues that the motion court clearly erred in denying his Rule 29.15 motion without granting an evidentiary hearing because his motion pleaded factual allegations which, if proven, would warrant relief and which are not refuted by the record. Movant's motion alleges he was denied his right to effective assistance of counsel and prejudice resulted because trial counsel failed to adequately question Victim at trial concerning her first statement to Officer Price. Movant contends the motion court erred in refusing to grant an evidentiary hearing on this allegation in his Rule 29.15 motion, not whether he is, in fact, entitled to relief. *See Masden v. State*, 62 S.W.3d 661, 664–65 (Mo.App.2001).

After the incident, Victim stated to Officer Price that she received her injuries as a result of being "jumped" outside the Juke Joint on the square in Springfield. Specifically, Movant alleges in his motion

that Victim told Officer Price that she had left the Juke Joint when it closed and began to walk home by herself when some black females approached her on South Avenue near the square; that the females pushed Victim to the ground and began punching and kicking her; that she heard one female repeat several times, "We're going to whoop this bitch"; that a female, whom Victim described as approximately twenty years old, five feet, four inches tall, with medium build and wearing dreadlocks, pulled Victim to her feet by her hair, pulled a knife, and said, "You have to die tonight"; that Victim tried to grab the knife, but was stabbed in the arm; and that the female assailants left after she had been stabbed. At trial, under cross examination by Movant's trial counsel, Victim admitted that she had lied to Officer Price about the "Juke Joint version" of the assault. After obtaining this admission, Movant's trial counsel did not question Victim any further about any of the specific details of the alleged "Juke Joint version" of the assault as related by Victim to Officer Price. It is this failure with which Movant claims his trial counsel was ineffective. Movant posits that, "[h]ad [Victim] no longer recalled these details or had she denied previously making these statements, counsel could have then asked Officer Price to recount the foregoing statements made by [Victim] on the day she was assaulted."

According to the record, Movant's trial counsel spent almost two hours cross-examining Victim, and the bulk of that cross-examination was directed toward impeachment. Trial counsel impeached Victim with regard to the amount of alcohol she consumed the night she sustained her injuries, how the actual altercation between Victim and Movant occurred, how many days she spent in the hospital, and if the front door was shut or open. Counsel also elicited admissions from Victim that she

lied to police about the "Juke Joint version" of the assault, that her mother had biases against Movant, and that Victim had a criminal record. Movant's trial counsel went to great lengths to illustrate to the jury that Victim was not a credible witness and that her testimony should be afforded little weight. Victim admitted that she had first told the police that she was attacked outside the Juke Joint and she later changed her story. Any further impeachment with regard to these statements would have been cumulative and unnecessary. "If a prior inconsistent statement by a state's witness does not give rise to a reasonable doubt as to Movant's guilt, such impeachment evidence is not the basis for a claim of ineffective assistance of counsel." *State v. Twenter*, 818 S.W.2d 628, 640 (Mo. banc 1991).

Furthermore, in finding that Movant was not prejudiced by trial counsel's failure to cross examine Victim further on the details of her statement to Officer Price, the motion court also took note of our observations on direct appeal:

> The physical facts supported Victim's claim that Defendant had assaulted her, further evidenced by signs of blood in various parts of the apartment. Victim's initial story that unknown girls had attacked her at the square was not supported by physical evidence. Lastly, the record reveals the virtual admission by Defendant of the criminality of his acts, when he told Detective Haefling he was "terribly sorry" and that he would do "anything in the world to make it right."

*Dismang*, 151 S.W.3d at 162–63.

In addition, the record discloses that Movant admits that he was not prejudiced by the actions of trial counsel in failing to further cross examine Victim. After the jury retired to deliberate, but prior to the announcement of their verdict, Movant was questioned regarding trial counsel's performance, and the following transpired:

THE COURT: As far as the questions that they asked of the State's witnesses, were they able to ask the questions that you had wanted them to ask and get the information out that you expected to happen?

THE [MOVANT]: At the end?

THE COURT: During the whole process of the trial, the questions, the cross-examination that they did, did you think that they asked the right questions and got the information that you thought they would be seeking?

THE [MOVANT]: Well, yes, sir. I think some other points should have been brought out, but since they wasn't I think they got the point at what they got.

Movant acknowledged that trial counsel was able to elicit the necessary testimony from the State's witnesses, and he felt that the jury got the point of counsel's cross-examination.

Movant was also questioned about counsel's performance at his sentencing hearing. At that time, the court specifically asked, "Were the questions that they asked and the cross-examination that they did of the witnesses you thought appropriate?" Movant replied, "Yes, sir."

Movant was questioned twice about counsel's performance and specifically about counsel's cross-examination of witnesses. At no time did Movant state that he felt counsel did a poor job on any cross examination, or that he was denied an opportunity to present a defense because of a deficiency in counsel's cross examination of a witness, or that counsel's inadequate cross examination somehow prejudiced him such that it would have changed the outcome of the trial.

Movant has the burden of establishing prejudice as part of the three-prong test necessary to entitle him to an evidentiary

hearing. *Maclin v. State*, 184 S.W.3d 103, 107 (Mo.App.2006). In its findings of fact and conclusions of law denying Movant's motion without an evidentiary hearing, the motion court found that the record conclusively demonstrates that, "even if there was error by counsel, Movant has established no prejudice by counsel's failure to question the victim any further about the specific details of her first statement." As we are not left with a firm and definite impression that the motion court made a mistake, we affirm the motion court's finding and its resultant denial of an evidentiary hearing. Point I is denied.

### (5) Point II—Denial of Evidentiary Hearing on Counsel's Alleged Failure to Adequately Redact Movant's Videotaped Statement to Police

In his second point, Movant argues that the motion court clearly erred in denying his Rule 29.15 motion without an evidentiary hearing, in that he was denied effective assistance of counsel and thereby prejudiced because trial counsel failed to adequately redact his videotaped statement to police before it was played to the jury.

Movant argues that counsel failed to redact from the videotape of Movant's interview a suggestion by Detective Haefling that Movant made comments to other "people" and "witnesses" regarding his assault on Victim and told them that he did not want "anybody to say anything about it."[3] Movant responded to this line of questioning, stating: "The last time I seen her she was in the hospital. I couldn't say nothing to nobody." A short time later in the interview, Movant stated: "I've never told anyone because I don't want to believe it. I've never done that before to nobody." The State did not call any witnesses to testify to any statements made by Movant or to rebut his denial, other than Victim and Detective Haefling.

Movant contends that Detective Haefling's comments were inadmissible hearsay and were prejudicial because they implied that there were other witnesses who knew about the assault and could corroborate Victim's testimony, but Movant could not confront and cross-examine those witnesses. In its findings, the motion court did not address the admissibility issue. Instead, it found that even if the statements by Detective Haefling were inadmissible, as Movant alleges, the record conclusively refutes that Movant was prejudiced by their admission, and therefore, not entitled to an evidentiary hearing on this allegation in his motion.

The first finding by the motion court that there was no prejudice to Movant states:

> The detective had testified at trial that the interview involved various techniques that included subterfuge, if not outright lies, in order to induce a confession.... [A]lthough Movant made other significant admissions in the course of the tape, he steadfastly denied making any statements to other witnesses about what happened. Given the absence of any witnesses to confirm the officer's statements when such witnesses would certainly have been expected to testify if

---

**3.** The questions by Detective Haefling challenged by Movant are:

> You should be able to remember it, because the next day after you had a chance to sober up, you saw the effects of what happened and you made comments to other people that overheard you say what happened to her when you were talking to her and you were talking about what happened

and the fact that you didn't want anybody to talk about this—what happened between you and her.

. . . .

You made some comments to her and comments to witnesses about what happened and that you didn't want anybody to say anything about it.

they existed, the most likely inference for the jury to draw is that the officer was deliberately misleading the defendant in the hopes of drawing out an admission. . . .

The second finding made by the motion court regarding lack of prejudice to Movant is:

Of much more significance [referring to its first finding set forth above] in determining the outcome was the physical evidence supporting the victim's story that Movant had committed the assault, including blood in various parts of the apartment, on Movant's socks, and including a bloody handprint on the carpet. . . .

The third and final finding made by the motion court demonstrating lack of prejudice to Movant is:

Movant's own admissions on the videotape which included, *inter alia,* the following:

[Movant:] If it weren't for her [Cowans] it never would have happened. . . . She's tellin' me a bunch of shit about [Victim].

[Detective Heafling:] Do you think something [Cowans] said, along with the pills and alcohol might have caused you to go off like you did? [Movant:] Yeah. . . . I told [Victim] I was sorry. [Cowans] fuckin' caused it. . . . I could've thought [Victim] was someone else. . . . I'm not the average guy who does this everyday. So what do I do? . . . Tell [Victim] I'm sorry. I'll do anything in the world to make it right.

Based upon these three findings, the motion court concluded that the record conclusively refuted any showing of prejudice to the Movant by the admission into evidence without objection of the challenged statements by Detective Heafling in the videotaped interview of Movant.

In this appeal, Movant fails to challenge any of these findings made by the motion court. Movant does not challenge any finding as not being supported by the record, not supporting the conclusion of no prejudice, either individually or collectively, or otherwise in any manner being clearly erroneous. In fact, Movant does not even mention these findings in his brief.

The motion court is required to make findings of fact and conclusions of law on all issues raised by a Movant in a motion for post-conviction relief. Rule 29.15(j); *Broom v. State,* 173 S.W.3d 681, 682 (Mo.App.2005). This requirement is not a mere formality. *Id.* at 683. "Appellate review of the motion court's denial of postconviction relief motion is not a *de novo* review; rather, the findings of fact and conclusions of law of the motion court are presumptively correct." *State v. Gilpin,* 954 S.W.2d 570, 575 (Mo.App.1997); *see also Anderson v. State,* 196 S.W.3d 28, 33 (Mo. banc 2006). Where, as in this case, a movant totally ignores the specific findings of the motion court, we have no choice, based upon their presumptive correctness, other than to find that they are not clearly erroneous. Point II is denied.

### (6) Conclusion and Decision

After a review of the entire record, we are not left with a definite and firm impression that a mistake has been made, and therefore, the findings and conclusions of the motion court denying the Movant an evidentiary hearing on his motion for post-conviction relief are not clearly erroneous. The judgment of the motion court is affirmed.

GARRISON and BARNEY, JJ., concur.