PER CURIAM.
Joshua Tyler Brown appeals from the denial, after an evidentiary hearing, of his Rule 29.15[1] motion to set aside his conviction for first-degree endangering the welfare of a child. His sole point asserts that the motion court clearly erred in denying his post-conviction motion, contending that trial counsel was ineffective due to a conflict of interest in that he represented both Brown and Brown's co-defendant at the time of Brown's trial. We affirm.
*423 Facts and Procedural Background
Brown was charged by amended information with the class C felony of first-degree endangering the welfare of a child[2] for causing injury to the face, head, buttocks, and body of a two-year old ("Victim"). Similarly charged was Victim's mother ("Co-defendant").[3]
Trial counsel ("Counsel") discussed the risks and advantages of concurrently representing *424 both Brown and Co-defendant with each independently. They each signed a written waiver of the potential conflict of interest in order for Counsel to represent them both. Brown and Co-defendant consistently indicated to Counsel that Victim's injuries were accidental, arising primarily from Co-defendant falling and dropping Victim, and then accidentally burning Victim on the heating pad.
Trial counsel considered the possible defense for Brown to blame Co-defendant entirely, but Counsel found no evidence to support that theory, nor did Brown want to pursue that theory because he said it had been an accident. Further, Counsel recognized that Brown had made a statement that he had been responsible for Victim's injuries, and thought it would be poor trial strategy for Brown to contradict himself and then blame Co-defendant. Counsel actively involved Brown in the selection of trial strategy and evidence. Counsel also investigated numerous witnesses who had seen Brown and Victim near the time Victim was alleged to have sustained her injuries, and ultimately adduced testimony from some of those witnesses at trial.
At Brown's jury trial, and consistent with the parties' common defense, Brown's trial theory was accident; i.e. , Victim was injured accidentally after Co-defendant dropped Victim and then placed her on a heating pad.
In support of this defense, Co-defendant voluntarily waived her Fifth Amendment right and testified as a witness for Brown. She stated that she slipped on stairs exiting Brown's house while holding Victim. She said that she placed Victim on a heating pad set on high, alternating it with cold materials every 15 minutes from 3 p.m. until 8 p.m. She testified she never saw Brown place Victim on the heating pad and never saw Brown cause any of Victim's injuries.
Brown testified in his own defense and was consistent with Co-defendant's testimony. The jury found Brown guilty as charged.
Brown filed a notice of appeal, voluntarily dismissed it, and timely filed a Rule 29.15 PCR motion alleging that Counsel was ineffective because of a conflict of interest arising out of Counsel's dual representation of Brown and Co-defendant. The motion court denied relief after an evidentiary hearing, finding inter alia that Brown failed to show a conflict of interest that adversely affected Counsel's representation of Brown, and that both Brown and Co-defendant asserted a common defense and signed written waivers. This appeal followed.
Discussion
Brown's sole point charges that the motion court erred in denying relief because Counsel's concurrent representation of Brown and Co-defendant created an actual conflict of interest that detrimentally affected his representation of Brown.[4]
We need not parse DePriest , our supreme court's 2017 conflict-of-interest PCR case, or consider other reasons to *425 affirm because Brown, on appeal, ignores repeated motion-court findings that Brown and Co-defendant were asserting a common defense such that this case is governed by
the "common defense" cases in which the courts have held that where defendant knew from the outset that counsel would represent all defendants, and where a common defense was asserted by all defendants, then no conflict of interest exists. See, e.g., Odom v. State, 783 S.W.2d 486, 488 (Mo. App. [W.D.] 1990) (no conflict where common defense asserted); Hopson v. State, 728 S.W.2d 276, 278 (Mo. App. [W.D.] 1987) (no conflict of interest where co-defendants' accounts of the circumstances were in substantial agreement); Smith v. State, 716 S.W.2d 467, 469 (Mo. App. [E.D.] 1986) (same).
State v. Kretzer , 898 S.W.2d 639, 645 (Mo. App. W.D. 1995). "Where, as in this case, a movant totally ignores the specific findings of the motion court, we have no choice, based upon their presumptive correctness, other than to find that they are not clearly erroneous." Dismang v. State , 207 S.W.3d 663, 670 (Mo. App. [S.D.] 2006). We cannot act as Brown's advocate by supplying arguments for why the motion court may be wrong or the above-cited cases distinguishable. See Mercer v. State , 547 S.W.3d 575, 578 (Mo. App. S.D. 2018). We affirm the judgment.[5]
CONCURRING OPINION
WILLIAM W. FRANCIS, JR., Judge
I concur with the Court's opinion here, but write separately to underscore the hazards that may surface when trial counsel proceeds with concurrent representation of co-defendants. While it is certainly permissible for counsel to embark upon concurrent representation, so long as the ethical requirements are satisfied, the perils of that representation may surface following an adverse result.
Furthermore, Brown has failed to demonstrate how trial counsel failed to meet the ethical requirements for concurrent representation and has not demonstrated how counsel's performance was compromised as a result of the concurrent representation. Most, if not all, of the evidentiary criticisms Brown raises in his appeal were satisfied by other evidence or strategies.
Finally, the assertion of a common defense alone may not be enough to meet the requirements set forth in DePriest v. State , 510 S.W.3d 331 (Mo. banc 2017). However, that issue is left for a future case.

All rule references are to Missouri Court Rules (2016).

See RSMo § 568.045 (Supp. 2009).

The motion court summarized the factual background of the criminal case as follows:
In 2013, [Co-defendant] had a two-year old daughter, [Victim], from a previous relationship with [Father]. [Co-defendant] shared custody of [Victim] with [Father], but there was no formal custody agreement in place. [Co-defendant] informally communicated with [Father] and his then girlfriend, [K.E.,] about exchanging custody of [Victim]. They also communicated generally about things that were going on in [Victim's] life.
Sometime in the beginning of 2013, [Co-defendant] began a relationship with [Brown]. [Father] and [K.E.] came to believe from their own observations that [Co-defendant] was staying with ... Brown on a regular basis and that [Victim] would stay there as well.
Between February 24, 2013, and March 5, 2013, [Co-defendant] had custody of [Victim]. When [Father] gave custody of [Victim] to [Co-defendant] on February 24, 2013, [Victim] did not have any visible injuries beyond a slight bump on the head. On March 4, 2013, [Co-defendant] sent [K.E.] a text message stating that [Victim] had fallen off of ... Brown's porch. [Co-defendant] further stated via text message that she had sat [Victim] on a heating pad after [Victim] appeared to have a bruise from the fall. [K.E.] and [Victim]'s grandmother advised [Co-defendant] via text message to alternate heat and ice on the injury. [Co-defendant] also informed [Father] and [K.E.] of blisters on Victim's buttocks. [Co-defendant], [K.E.], and [Father] continued to text and call discussing when [Father] and [K.E.] could have custody of [Victim]. [Co-defendant] seemed to be hesitant to give over custody of [Victim]. Eventually, [Co-defendant] agreed that [Father] and [K.E.] could pick up [Victim] on March 6, 2013. [K.E.] picked [Victim] up because [Father] was at work.
[K.E.] picked up [Victim] between 5:30 and 6:00 P.M. on March 6, 2013. At that time, [Victim] was quiet and was "staring off into space," which was abnormal. [K.E.] drove [Victim] home and, after further examination, noticed that [Victim] was missing some hair, had sustained some injuries to her face and side, and had burns on her buttocks. [Victim] stated that "Josh" had hurt her. [K.E.] took [Victim] to the emergency room. [Father] met them there.
At the hospital, it was discovered that [Victim] had multiple small bruises on her face and spine which appeared to have occurred at different times. There were scratches on [Victim]'s face. [Victim]'s left index finger was red, swollen, and had a small lesion. She had also sustained second-degree burns to her buttocks. There were open blisters on [Victim]'s buttocks from the burns. The emergency room nurse did not believe that these types of burns could result from resting on a heating pad for less than two hours. There were areas of hair loss on [Victim]'s head with signs that the hair had been pulled out. Medical professionals confirmed that all of these injuries were consistent with physical abuse. [Victim] was very upset and "was not easily consoled."
At 12:30 A.M. on March 7, 2013, law enforcement officers went to [Brown]'s residence. [Brown] came to the door and allowed the officers to enter. [Co-defendant] was also in the residence and appeared upset. [Brown] spontaneously told officers that he had put [Victim] on the heating pad, that it was all his fault, and that [Co-defendant] had nothing to do with it. [Brown] also stated that [Father] and his family had told [Co-defendant] to put [Victim] on the heating pad.
In the weeks after March 6, 2013, [Victim] made more statements regarding her injuries. [Victim] stated that "Josh" had hurt her, put her in the corner, pulled her hair, and burned her "bottom." She also stated that "Josh" had hurt her finger. [Victim] would start crying "out of the blue" at bath time. Other times, [Victim] would suddenly wake up and "be screaming and crying and kicking saying he hurt me, he hurt me."
(internal citations to the record are omitted).

The point goes on to blame the alleged conflict for certain trial decisions by Counsel that allegedly prejudiced Brown, but "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Cuyler v. Sullivan , 446 U.S. 335, 349-50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), quoted in DePriest v. State , 510 S.W.3d 331, 338-39 (Mo. banc 2017). We understand the point as seeking, implicitly, to "overcome the presumption that [C]ounsel's challenged acts or omissions were sound trial strategy." State v. Starks , 856 S.W.2d 334, 336 (Mo. banc 1993).

We would be remiss not to state again that, although Brown complains that dual representation kept Counsel from casting fault on Co-defendant, Counsel called Co-defendant as a trial witness on Brown's behalf, where she waived her Fifth Amendment right against self-incrimination and offered testimony consistent with Brown's innocence, including personally accepting blame for some of Victim's injuries and stating that Brown was at work when those occurred. That said, the concurring opinion could not be more correct in citing the perils of concurrent legal representation in situations like this.