STATE of Missouri, Respondent,

v.

Eric WINFREY, Appellant.

No. SC 90830.

Supreme Court of Missouri,
En Banc.

April 12, 2011.

Rehearing Denied May 31, 2011.

Melinda K. Pendergraph, Public Defender's Office, Columbia, for Winfrey.

Jayne T. Woods, Attorney General's Office, Jefferson City, for the State.

PATRICIA BRECKENRIDGE, Judge.

## Introduction

Eric Winfrey appeals his convictions and sentences for first-degree murder and first-degree robbery. After being found guilty by a jury, Mr. Winfrey was sentenced as a prior offender to consecutive sentences of life imprisonment without parole on the murder charge and life imprisonment on the robbery charge. Because the trial court erred by refusing to allow Mr. Winfrey to cross-examine a witness who previously had admitted to shooting the victim and Mr. Winfrey was prejudiced as a result, the judgment of the trial court is reversed. The case is remanded for a new trial.

## Factual and Procedural Background

This Court reviews the evidence in the light most favorable to the jury's verdict. *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009). Viewed in that light, the facts of the case are as follows: On June 2, 2004, Christopher Hanneken was working a shift as the manager at Storage USA, a storage-unit rental company. The last person to speak with Mr. Hanneken that day was a friend; their telephone conversation ended at 2:42 p.m. Just before 3 p.m., a delivery truck driver made a stop at Storage USA and found Mr. Hanneken's body in an employee-only area of the business. Mr. Hanneken had been fatally shot in the head with a .38 or .357 caliber gun. Investigators discovered that surveillance tapes were missing from the Storage USA security system and $395 in cash was missing from the company's register.

The day following the murder, police interviewed Eric Winfrey. Prior to the murder, Mr. Winfrey lived in an apartment above Storage USA, occasionally performed tasks around the business, and was familiar with its operations. During the interview, police questioned Mr. Winfrey regarding his whereabouts on the day of the murder. Although police had not informed Mr. Winfrey of the timeframe for the murder and robbery, he immediately responded by stating his location between 2 p.m. and 4 p.m. Upon further questioning, Mr. Winfrey specified that after leaving a gas station at 2 p.m., he returned to his apartment complex, where he encountered one of his friends. He stated that he accompanied the friend to the friend's apartment, where they smoked marijuana together. Mr. Winfrey stated that, after leaving the friend's apartment, he returned to his own apartment, watched television, and woke up his girlfriend at 3:15 p.m. so she could get ready for work.

During the interview, police asked Mr. Winfrey if he owned a gun. Although he denied owning a gun, Mr. Winfrey admitted that he had tried unsuccessfully to obtain a gun from several individuals, including a person named Justin Lewis. It also came to light during the interview that Mr. Winfrey was more than $8,500 in debt and that he had an argument with his girlfriend about finances on the day of the murder and robbery.

Police later interviewed Mr. Winfrey's girlfriend, Corener Harris. Ms. Harris stated that on the day the crimes were committed, Mr. Winfrey left their apartment at approximately 2 p.m. When she asked him why he was leaving, Mr. Winfrey did not respond. Ms. Harris stated that she did not see Mr. Winfrey again until he picked her up from work early the following morning. She denied that Mr. Winfrey woke her up for work at 3:15 p.m. as he had told police.

In a subsequent interview, police questioned Ms. Harris about whether Mr. Winfrey ever had possessed or owed a gun. Ms. Harris stated that Mr. Winfrey told her he had obtained a gun from a friend. Initially, Ms. Harris denied ever seeing Mr. Winfrey in possession of a firearm, but she subsequently changed her story and stated that she saw him with a gun at their apartment before the murder and robbery took place. She stated that when she saw the gun, she asked him why he had it. Mr. Winfrey responded by stating, "I got to do what I got to do."

Thereafter, police confronted Mr. Winfrey with Ms. Harris' statements concerning his whereabouts at the time of the murder and about his possession of a gun. When police informed Mr. Winfrey that Ms. Harris said she did not see him after 2 p.m. on the day of the crimes, he agreed with her recollection of the time. He further admitted that he did not wake her up at 3:15 p.m., as he had originally told police. When confronted with Ms. Harris' statements regarding the gun, Mr. Winfrey admitted that he told Ms. Harris he had a gun. However, he stated that he also told her that he gave the gun back to Justin Lewis.

Mr. Winfrey subsequently was charged with first-degree murder and first-degree robbery in connection with the events that occurred at Storage USA. The case went to jury trial beginning October 20, 2008. At trial, Justin Lewis was called to testify on behalf of the state. He testified that he helped Mr. Winfrey procure a handgun from a person named Daniel Cosgrove. Mr. Lewis stated that after Mr. Winfrey took possession of the gun, Mr. Lewis never saw the weapon again. Mr. Lewis' story regarding the gun was confirmed by Mr. Cosgrove, who also testified at trial.

Mr. Cosgrove identified the gun he gave to Mr. Lewis as a .38 caliber handgun. Mr. Cosgrove testified that at the time of the exchange, he was under the impression that Mr. Winfrey wanted the gun to rob or scare someone.

At trial, Kevin Covington, an inmate who was incarcerated at the Farmington Correctional Center with Mr. Winfrey, also testified for the state. After Mr. Winfrey was questioned by a detective investigating the Storage USA murder, Mr. Winfrey approached Mr. Covington to discuss the situation. To help secure early release, Mr. Covington later decided to begin gathering information about the murder and robbery to turn over to the state. In an effort to gain Mr. Winfrey's confidence, Mr. Covington falsely reported that his wife had friends who worked in the St. Charles police department who could help Mr. Winfrey if Mr. Winfrey revealed all of the facts concerning the crimes. After hearing this information, Mr. Covington testified that Mr. Winfrey confessed to shooting the victim. Mr. Covington stated that Mr. Winfrey admitted obtaining a gun from a friend named Justin and that Mr. Winfrey disposed of the weapon after the murder by throwing it into the Mississippi River.

On the basis of the aforementioned evidence, the jury found Mr. Winfrey guilty of first-degree murder and first-degree robbery. Mr. Winfrey was sentenced by the trial court as a prior offender to life imprisonment without parole on the murder charge and life imprisonment on the robbery charge, to be served consecutively. Mr. Winfrey appeals. After an opinion by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

Mr. Winfrey raises 12 points on appeal. Eleven of those points relate to claimed evidentiary errors. First, Mr. Winfrey claims that an African–American venireperson was struck unconstitutionally from the jury on the basis of race. Second, Mr. Winfrey claims that the trial court erred by limiting his cross-examination of Mr. Covington regarding his conduct violations in prison. Next, Mr. Winfrey claims that the trial court erred in sustaining the state's hearsay objection to his proposed cross-examination of Mr. Lewis regarding whether he told another person that he committed the murder. Next, Mr. Winfrey claims nine separate errors, alleging the trial court improperly admitted evidence of other crimes and bad character.

## Standard of Review

The issues analyzed in this case involve claims challenging the trial court's limitations on the cross-examination of certain witnesses and its rulings on the admissibility of certain evidence. On appeal, a trial court's ruling regarding the admissibility of evidence and the extent and scope of cross-examination is reviewed for abuse of discretion. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006); *State v. Taylor*, 134 S.W.3d 21, 25 (Mo. banc 2004). The trial court abuses its discretion when its ruling is "clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005). However, this Court reviews the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999). Trial court error is prejudicial if there is a "reasonable probability that the court's error affected the outcome of the trial." *State v. Barriner*, 111 S.W.3d 396, 401 (Mo. banc 2003).

## Justin Lewis' Statement that he Shot the Victim

Because Mr. Winfrey's claim of error regarding his proposed cross-examination

of Mr. Lewis is dispositive, it is addressed first. In this claim, Mr. Winfrey argues that the trial court erred by sustaining the state's hearsay objection to his question asking Mr. Lewis if he told a third party that he shot the victim. At trial, the state called Mr. Lewis to testify regarding his role in procuring for Mr. Winfrey the handgun that allegedly was used in connection with the murder at Storage USA. During cross-examination, defense counsel sought permission from the trial court to ask Mr. Lewis if he told a third party, Nick Reynolds, that Mr. Lewis shot the victim at Storage USA. Defense counsel stated that he had a good-faith basis for asking the question based on discovery. After the trial court initially indicated it would allow defense counsel to ask the question, the state objected on the basis that the question sought to elicit hearsay. In response to the objection, defense counsel advised the trial court that he had evidence that Nick Reynolds said Mr. Lewis told him that he shot the victim. The trial court sustained the state's objection but permitted Mr. Winfrey to make an offer of proof. In the offer of proof, defense counsel stated:

> The question I want to ask Justin Lewis is, [']did you tell Nick Reynolds you shot the guy at Storage USA[?']. The question I offer, my offer of proof is that if he states yes that is an admission to the crime. It's relevant evidence that should be considered by this jury. This question seeks to elicit that admission directly from Justin Lewis. I have a good faith basis for asking the question based on discovery that was presented to me.

After hearing the offer of proof, the trial court adhered to its initial ruling and excluded the proffered question on the ground that it sought to elicit hearsay and no applicable hearsay exception had been established.

In making its ruling, the trial court focused solely on whether Mr. Lewis' statement that he shot the victim was relevant to prove that Mr. Lewis shot the victim rather than Mr. Winfrey—that is, to prove the truth of the matter asserted. In so ruling, the trial court erred. Although offering Mr. Lewis' out-of-court statement to prove the truth of the matter asserted is a hearsay use of the evidence, the evidence was also admissible for the non-hearsay purpose of impeaching Mr. Lewis' credibility.[1]

▬▬ "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends upon the veracity of the statement for its value." *State v. Sutherland,* 939 S.W.2d 373, 376 (Mo. banc 1997). Such statements are generally inadmissible unless they fall within a recognized exception to the hearsay rule. *Id.* However, if an out-of-court statement is not admitted to prove the truth of the matter asserted, but for some other purpose that is independently relevant without reference to the truthfulness of the statement, then the statement is non-hearsay. Kenneth S. Broun, et al., McCORMICK ON EVIDENCE vol. 2, § 249 (6th ed., West 2006); John C. O'Brien, MISSOURI LAW OF EVIDENCE § 11–4 (4th ed.2002); *State v. Mallett,* 732 S.W.2d 527, 536 (Mo. banc 1987) (the hearsay rule is inapplicable when the extrajudicial statement is not offered to

---

1. Had Mr. Winfrey simply rephrased the form of the question to ask Mr. Lewis "did you shoot the victim?" there would have been no hearsay issue because Mr. Lewis' answer would be based on his own knowledge and would not rely on the use of a previously unsworn out-of-court statement.

prove the truth of the matters asserted therein).[2]

■ In the present case, Mr. Lewis' statement that he killed the victim was relevant to impeach his credibility as a witness.[3] *See State v. Foster*, 349 S.W.2d 922, 924–25 (Mo.1961) (A witness can be asked if he admitted committing a crime to attack his credibility). If Mr. Lewis admitted that he made the statement to Mr. Reynolds, even if the statement was untrue, it still would be relevant for impeachment purposes. The fact that Mr. Lewis, as a testifying witness, would claim falsely that he committed the very murder for which Mr. Winfrey is now on trial affects Mr. Lewis' credibility as a witness. Consequently, the trial court was wrong to find that even if Mr. Lewis admitted making the statement, it would be irrelevant because it would not prove he actually committed the crime. A witness's willingness to claim falsely that he committed the murder for which the defendant is now on trial casts serious doubt on the truthfulness of the witness's other testimony. If the witness is willing to lie about committing the crime in the very case in which he is testifying, the witness might be equally willing to testify untruthfully about other matters in the case. Because such an interest in testifying is probative to the weight the jury gives to the witness's testimony, the statement showing the interest should be available for the jury's consideration in assessing credibility. When introduced for that purpose, the statement is independently relevant without reference to the truthfulness of the statement, thereby removing it from the hearsay doctrine.

■ Likewise, even if it is presumed that Mr. Lewis would admit making the statement, and the statement actually was true, the evidence still would be relevant for the non-hearsay purpose of impeaching Mr. Lewis' credibility because it would show his interest in testifying against Mr. Winfrey. In criminal cases, interest is shown by evidence that the witness has a stake in the outcome of a criminal proceeding. *See, e.g., State v. Pigques*, 310 S.W.2d 942, 947–950 (Mo.1958). Clearly, Mr. Lewis' alleged statement, if true, would reveal that Mr. Lewis had an interest in testifying against Mr. Winfrey to ensure his conviction and to divert attention away from Mr. Lewis' own involvement. When admitted for the purpose of revealing Mr. Lewis' interest in testifying against Mr. Winfrey, the evidence would come in for the non-hearsay purpose of impeaching Mr. Lewis. Accordingly, the trial court erred in prohibiting Mr. Winfrey from ask-

2. This Court has recognized the admissibility of certain out-of-court statements for various non-hearsay purposes. *E.g., State v. Copeland*, 928 S.W.2d 828, 848–849 (Mo. banc 1996) (statements of defendant's husband were "verbal acts" offered to show means by which victims became caught up in criminal plot); *State v. Chambers*, 891 S.W.2d 93, 104 (Mo. banc 1994) (statement was admissible to show the declarant's "state-of-mind" toward another); *State v. Isa*, 850 S.W.2d 876, 888 (Mo. banc 1993) (recordings of the actual murder and telephone conversations made from the defendant's home before and after the murder were admissible to show defendant's "state-of-mind" and participation in the murder).

3. While defense counsel did not specifically state that he was offering the evidence to show the partiality of Mr. Lewis, counsel argued the relevance of evidence that Mr. Lewis admitted committing the murder. It is inherent that a witness's alleged admission to committing the very crime charged in the criminal case in which the witness now is testifying against the defendant is relevant to the jury's determination of the witness's credibility. The significance of such an admission was sufficiently apparent to appraise the trial court of the relevance of the evidence.

ing Mr. Lewis if he told Mr. Reynolds that he shot the victim.[4]

■ Because Mr. Lewis' statement was admissible for the non-hearsay purpose of impeaching his credibility by showing his interest, the question is whether the trial court abused its discretion by excluding Mr. Winfrey's proposed cross-examination into the topic. In *Mitchell v. Kardesch*, this Court clarified the law regarding how a party may challenge the credibility of an adverse witness who is on the stand. 313 S.W.3d 667 (Mo. banc 2010). In that case, the Court discussed the most common methods of impeaching a witness, including "evidence of the witness's bias, interest or prejudice." *Id.* at 675. It is well-established that the interest of a witness is never irrelevant. *Id.* at 676 (quoting *State v. Johnson*, 700 S.W.2d 815, 817 (Mo. banc 1985)). Consequently, cross-examination about any issue is permissible if it shows the bias or interest of the witness "because a witness's bias or interest could affect the reliability of the witness's testimony on any issue." *Id.* Although the trial court has discretion in limiting the scope and extent of cross-examination bearing on the witness's bias or interest, the court cannot bar cross-examination into that subject completely. *State v. Solven*, 371 S.W.2d 328, 332 (Mo. banc 1963).

■ In the present case, defense counsel stated that he had a good faith basis due to discovery he received to ask Mr. Lewis if he admitted shooting the victim to Mr. Reynolds. As noted above, Mr. Lewis' statement admitting that he shot the victim was relevant to impeach his credibility by showing his willingness to claim falsely that he committed the same crime for which Mr. Winfrey was on trial and by showing his interest in testifying against Mr. Winfrey. Although the statement revealed Mr. Lewis' interest in testifying against Mr. Winfrey, the trial court completely barred defense counsel from inquiring into Mr. Lewis' prior statement. By barring all cross-examination into that topic, the trial court abused its discretion. *Id.*

■ Additionally, the trial court's refusal to allow impeachment of Mr. Lewis based on his interest was prejudicial. The state's evidence against Mr. Winfrey was based entirely on circumstantial evidence, with the exception of testimony by a prison informant who had a motive to testify favorably for the state in order to obtain parole. Evidence showing Mr. Lewis' interest to lie about the circumstance surrounding Mr. Winfrey's acquisition of the unrecovered gun allegedly used in the murder was significant to the jury's determination of credibility and its weighing of the evidence. In other jurisdictions, courts have held it is reversible error for a trial court to refuse to allow cross-examination of a prosecution witness suspected of committing the crime for which the defendant is on trial regarding the witness' motive for testifying against the defendant. *See, e.g., Martinez v. State*, 904 P.2d 138, 140–41 (Okla.Crim.App.1995) (in prosecution for murder arising out of arson, trial court committed reversible error by pro-

---

4. Because Mr. Winfrey was not allowed initially to ask Mr. Lewis if Mr. Lewis admitted to Nick Reynolds that he was the person who killed the victim at Storage USA and determine whether Mr. Lewis would admit making the statement, there was no attempt by Mr. Winfrey to lay a foundation to admit Mr. Reynolds's testimony to show Mr. Lewis's prior inconsistent statement, *see* section 491.074, RSMo 2000; *State v. Reed*, 282 S.W.3d 835, 838 (Mo. banc 2009); *State v. Granberry*, 491 S.W.2d 528, 530–31 (Mo. banc 1973), or his declaration against penal interest, *see State v. Davidson*, 982 S.W.2d 238, 242 (Mo. banc 1998); *State v. Blankenship*, 830 S.W.2d 1, 6 n. 3 (Mo. banc 1992).

hibiting cross-examination of eyewitness, who testified he saw defendant set the house on fire, regarding witness' history of setting fires because such evidence was relevant to his possible motive to lie to avoid blame for setting fire himself); *Moynahan v. Manson*, 419 F.Supp. 1139, 1143 (D.Conn.1976) (conviction vacated because trial court denied defendant's right to confrontation by not allowing cross-examination of an important prosecution witness concerning witness' possible bias due to his involvement, or suspected involvement, in same criminal scheme for which defendant was on trial); *Commonwealth v. Graziano*, 368 Mass. 325, 331 N.E.2d 808, 811 (1975) (evidence that prosecution witness's conduct made it likely he would be a suspect, that he was in fact suspected and that he thought he was suspected, was relevant to his motive in testifying and therefore to his credibility, and refusal to allow cross-examination designed to show that his motive for testifying was to protect himself was reversible error).

Under the circumstances presented in this case, there is a reasonable probability that the trial court's refusal to allow Mr. Winfrey's proposed cross-examination of Mr. Lewis affected the outcome of the trial. *Barriner*, 111 S.W.3d at 400–01. Accordingly, Mr. Winfrey's convictions are reversed, and the case is remanded for new trial. Because the Court reverses on this issue, the remainder of the opinion addresses only Mr. Winfrey's additional claims of trial court error that are likely to arise on remand.

### Cross–Examination of Kevin Covington Regarding Prison Conduct Violations

▮ Mr. Winfrey next argues that the trial court abused its discretion by sustaining the state's objection to his proposed cross-examination of Mr. Covington regarding conduct violations he received in prison for lying to prison guards, giving false information to prison staff, and possessing contraband. Specifically, Mr. Winfrey argues that Mr. Covington's conduct violations for making false statements and lying to prison staff were admissible to impeach Mr. Covington's character for truth and veracity. Because it is probable that Mr. Covington will be called as a witness at a new trial and that Mr. Winfrey again will attempt to impeach the credibility of his testimony, the Court will address his claim of error.

At trial, Mr. Covington testified on behalf of the state that Mr. Winfrey confessed to shooting the victim. On direct examination, the state asked Mr. Covington if he received any benefit from testifying for the state. Mr. Covington admitted that he received a letter from the prosecutor recommending his parole and had been given a release date by the parole board. However, Mr. Covington subsequently stated that he was being paroled on his merits, not because of the prosecutor's letter to the parole board.

During cross-examination, defense counsel attempted to question Mr. Covington's earlier statement that he was paroled on his merits. Before defense counsel could proceed with questioning, the prosecutor approached the bench and advised the court that he believed defense counsel was attempting to impeach Mr. Covington with specific instances of misconduct that occurred while he was in prison. The prosecution argued that such evidence constituted improper impeachment evidence. Defense counsel responded by arguing that he intended to rebut Mr. Covington's earlier assertion that he was being paroled on his merits by showing that he had multiple conduct violations while in prison.

After the trial court sustained the state's objection, defense counsel made an offer of

proof by reading an excerpt from Mr. Covington's deposition in which he admitted that he was cited for at least 35 conduct violations while in prison. In the deposition, Mr. Covington stated that his violations included lying and giving false information to prison staff. Ultimately, the trial court sustained the state's objection and prohibited cross-examination regarding the conduct violations on the basis that the violations did not involve lying in sworn statements or Mr. Covington's reputation for truthfulness.

To support his argument that the trial court erred in refusing to allow him to cross-examine Mr. Covington regarding his prison conduct violations, Mr. Winfrey cites this Court's recent decision in *Mitchell v. Kardesch*. Mr. Winfrey argues that because some of the conduct violations involved lying or giving false information to prison staff, they were admissible impeachment evidence that reflected on Mr. Covington's character for truth and veracity. Contrary to Mr. Winfrey's argument, *Mitchell* does not stand for the proposition that all dishonest statements are admissible for purposes of impeaching a witness' character for truth and veracity.

In *Mitchell*, this Court held that a witness may be impeached on cross-examination with specific instances of misconduct relevant to the witness' character for truth and veracity. *Id.* at 676–79. However, the Court noted that the admission of such evidence is subject to the trial court's discretion in limiting or excluding such evidence when its probative value is outweighed by its prejudicial effect. *Id.* at 676, 679. Regarding the probative value of prior lies, the Court stated, "the fact that a person has told a lie on an irrelevant issue that is remote in time or subject may

make the [ ] evidence of little value in determining the witness' character for truth and veracity." *Id.* at 681–82.

The nature of false statements and circumstances under which they are made is needed to determine whether such statements are admissible to impeach a witness's character for truth and veracity. Without providing evidence of the nature and circumstances of Mr. Covington's false statements in his offer of proof, Mr. Winfrey failed to show that those statements were relevant to Mr. Covington's character for truth and veracity. During his offer of proof, Mr. Winfrey established only that Mr. Covington had conduct violations for "lying to [prison] staff" and for "[g]iving false information." The offer of proof did not include the subject and circumstances of the lies or when the lies occurred. Additionally, Mr. Winfrey did not introduce evidence showing that Mr. Covington's conduct violations would have precluded parole under normal circumstances. Such information is important to determine the probative value of the conduct violations because Mr. Winfrey's argument at trial was that evidence of the conduct violations would rebut Mr. Covington's earlier statement that he was paroled on his merits. With such scant information, the trial court did not abuse its discretion in finding that such lies were not legally relevant to Mr. Covington's character for truth and veracity.

### Evidence of Other Crimes and Bad Character Evidence

Mr. Winfrey's other claim of error that is likely to occur on remand is his claim that the trial court erred by allowing the state to elicit evidence about other crimes and bad acts he committed.[5] Specifically,

---

5. Mr. Winfrey actually raises his claims that the trial court erred in admitting evidence of

other crimes and bad acts in eight separate

Mr. Winfrey argues that the trial court erred when it allowed the state to elicit evidence that Mr. Winfrey stole rental furniture after the murder; commonly failed to pay his utility bills and then moved to avoid payment; filed a false police report claiming that he was robbed of $400 when he actually lost the money gambling; stole a car from his former employer; wrote bad checks; and left his apartment with razor blades after having an argument with his girlfriend about finances, and then checked himself into a hospital for counseling. He also argues that the trial court erred when it allowed the state to introduce evidence that someone burglarized the apartment above Storage USA prior to the murder and that someone broke into Mr. Winfrey's car while it was impounded.

Generally, evidence of prior bad acts is inadmissible to show the propensity of the defendant to commit the crime for which he is charged. *State v. Fassero,* 256 S.W.3d 109, 118 (Mo. banc 2008). However, evidence of such misconduct is admissible "to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the alleged perpetrator." *State v. Davis,* 211 S.W.3d 86, 88 (Mo. banc 2006). The offered evidence must be both logically relevant, in that it has some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial, and also legally relevant, in that its probative value outweighs its prejudicial effect. *State v. Mayes,* 63 S.W.3d 615, 629 (Mo. banc 2001).

Here, much of the evidence of Mr. Winfrey's prior misconduct was admitted to establish his financial motive for committing the crimes with which he was charged.

At trial, the state developed the theory that Mr. Winfrey was under significant financial stress and that he broke into Storage USA to steal money from the business. Therefore, evidence that he stole a car because he could not afford cab fare, passed bad checks prior to the date of the offenses due to insufficient funds in his bank account, and filed a false police report to cover up a $400 gambling debt was relevant to demonstrate his dire financial situation before the crimes occurred. Likewise, evidence that he left his apartment with razor blades after having an argument with his girlfriend over finances and checked himself into a hospital was relevant to establish motive because it demonstrates the severity of his emotional distress over his financial situation and supports the inference that he had a strong motive to rob Storage USA. *See Mayes,* 63 S.W.3d at 633 (evidence that defendant fought several times with his wife and was fired from his job prior to murders was relevant to motive because it showed that he suffered from marital pressures and financial difficulties).

Evidence of additional other crimes and bad acts does not relate to motive and, if presented in the same manner as it was at the original trial, would lack legal relevance. First, evidence that Mr. Winfrey stole rental furniture, fraudulently obtained utilities, or bad checks passed *after* the commission of the crimes [6] does not show a motive to commit the charged offenses. Specifically, the fact that Mr. Winfrey continued to have financial problems after the murder and robbery were committed is not probative to his motive to commit crimes that already have occurred. On the other hand, the prejudicial effect of introducing additional

points. For brevity, these points will be addressed together.

6. The exhibits in the record reflect that at least two checks introduced into evidence were dated after the crimes occurred.

bad acts is that the jury might misuse that evidence and convict Mr. Winfrey on the basis of his post-murder bad acts, rather than the crimes for which he was on trial.

■ Additionally, the state's evidence regarding the break-in of Mr. Winfrey's car at the towing lot and the burglary of the apartment above Storage USA is not legally relevant. Evidence that Mr. Winfrey's vehicle was broken into has no logical relevance to the case because it did not tend to prove or disprove any fact at issue in the case. *Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo. banc 1993) (defining the test for logical relevancy). At trial, the officer who testified about the break-in of Mr. Winfrey's vehicle at the towing lot did not testify that Mr. Winfrey was involved in the incident. The officer merely testified that Mr. Winfrey's vehicle had been broken into at a time after the crimes were committed and that it was the only vehicle broken into on the lot. In its brief, the state concedes that the break-in of Mr. Winfrey's automobile lacked relevancy. Because the evidence has the potential to mislead the jury into believing that Mr. Winfrey broke into his own car despite no evidence actually tying him to the crime, such evidence is unfairly prejudicial to the defendant.

■ The evidence regarding the burglary of the apartment above Storage USA prior to the date of the crimes at issue also is not legally relevant. At trial, the officer who investigated the break-in above Storage USA testified that he had no knowledge or any information tying Mr. Winfrey to the incident. In its brief, the state argues that evidence of the prior break-in at Storage USA was logically relevant to show that doors to the Storage USA building were damaged before the murder. The state argues the fact of prior damage to the Storage USA building establishes that the perpetrator did not need to break

into the building to commit the crimes. While the fact that the doors were damaged may be logically and legally relevant, the source of the damage is not. The prejudicial effect of evidence that there was a prior burglary of the apartment where Mr. Winfrey used to live is great. In light of the significant evidence of other crimes committed by Mr. Winfrey that is admissible to show motive, there is the likelihood that the jury would speculate that Mr. Winfrey committed the prior robbery at Storage USA, particularly if the witness again testifies that he does not know whether there was evidence to connect Mr. Winfrey to this crime. Any probative value of the evidence of a prior burglary at Storage USA is outweighed by the prejudicial effect it would have on the jury.

### Conclusion

The trial court erred by refusing to allow Mr. Winfrey to cross-examine Mr. Lewis regarding his statement that he shot the victim. As a result of that error, Mr. Winfrey was prejudiced. Accordingly, the judgment of the trial court is reversed and the case is remanded.

All concur.