

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI,

          **Respondent,**

v.

JOSEPH SIMMONS,

          **Appellant.**

**WD78998**

**OPINION FILED:**

**January 10, 2017**

**Appeal from the Circuit Court of Caldwell County, Missouri
The Honorable Richard Brent Elliott, Judge**

**Before Division Three:
Alok Ahuja, P.J., Victor C. Howard, and James Edward Welsh, JJ.**

Joseph Simmons appeals the circuit court's judgment following a jury trial convicting him of first-degree statutory sodomy. We affirm.

### Background

In November 2014, the State charged Simmons with first-degree statutory sodomy (§ 566.062, RSMo[1]) for subjecting his five-year-old great-granddaughter ("Victim"[2]) to deviate sexual intercourse during the time period of August 2013-August 2014.

---

[1]Statutory references are to the Revised Statutes of Missouri (RSMo) 2000, as updated by the 2013 Cumulative Supplement.

[2]We do not use the names of the children or related parties (except for the Appellant) in order to protect the children's identities. *See* § 566.226, RSMo.

The case was tried before a jury in April of 2015. The State's witnesses were the Victim and her brother, mother, father, and stepmother, an officer who investigated the case, and a Child Advocacy Center interviewer. Simmons' witnesses consisted of two of his daughters (including the Victim's grandmother), a granddaughter, his medical doctor, and himself.

Viewed in the light most favorable to the verdict,[3] the evidence showed that, during the period in question, Victim was four and five years old, having turned five in September of 2013. At that time, Victim was in the custody of her grandmother ("Grandmother"), who is Simmons' daughter and the mother of Victim's father. The evidence further showed that, although Grandmother had custody of Victim, Victim slept next door at Simmons' house.

In July 2014, Victim's father ("Father") and stepmother ("Stepmother") regained custody of Victim.[4] They soon discovered that Victim was "touching other people inappropriately" and "doing things to other children," including at school. She was "always looking through the bathroom" trying to "catch the boys when they were in the shower without any clothes on" and "doing a lot of kissing" of boys. She reportedly had kissed multiple male cousins (sometimes with her tongue out), including one with whom "she [tried] to get under the [bedroom] covers." When Father asked Victim about her actions, her answer revealed the abuse by Simmons.

Victim told Father, in the presence of Stepmother, that "she had popped a pimple and played with his balls, my grandpa," referring to Simmons. Victim also told Stepmother that "bad things had happened to her" with Simmons, "that she would have to rub his balls and sometimes his wiener" and that they would "pop the pimple." Victim explained, in response to Stepmother's quizzical expression, "[y]ou know, that white/yellow stuff sometimes that comes out."

---

[3]*See State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009).

[4]In 2010, while Mother and Father were in the midst of a divorce and Father was facing a five-month jail term, Grandmother gained custody of Father's four children. In 2013, Father filed a lawsuit to regain custody.

Father and Stepmother contacted the Sheriff's Department. According to Sergeant Tony Kirkendoll, Father called the department and stated that Victim "had said some things to him and [Stepmother] that were alarming to him." Kirkendoll and another officer went to Father's home to investigate, and Father and Stepmother related Victim's allegations about Simmons. After hearing the allegations, the officers arranged for Victim and her older brother ("Brother") to be interviewed at the Children's Advocacy Center ("CAC").

After the officers left, Stepmother called Victim's mother ("Mother") to tell her what Victim had told them. Mother testified that, when she later talked to Victim about the matter, Victim told her the same things that she had told Father, using the same explicit language. Victim told Mother that she had not mentioned the incidents because she did not want Mother to be mad at her. Mother told the jury that Simmons "definitely" showed favoritism toward Victim, in that he gave her gifts and money, and she was "never really allowed to get in trouble, *per se*."

At her CAC interview, Victim disclosed that "every day and every night" (specifically, every day when she woke up) Simmons forced her to rub his "wiener" and/or "nuts" (genitalia) with her hands and "pop the pimple," which caused "white stuff" to come out in the shape of a "rainbow." She said that Simmons made her wipe the white stuff on her pants. The interviewer testified that she believed Victim "was talking about ejaculation." Victim demonstrated to the interviewer how Simmons' sex organs would change shape when she rubbed him. Victim described Simmons' "nuts" as looking and feeling like a ball of water. She also stated that she had to touch Simmons' genitals with a towel and "wiggle it around." Victim told the interviewer that Simmons tried to touch her genitals and "butt" and tried to put something long, pink, and plastic in her "butt." Victim said that, when Simmons gave her a bath, he would touch her "bad spot" (her genital area) with his hand during the bath and while drying her off. Victim also

3

stated that Simmons had threatened to shoot her or call the police and have her put in jail if she refused to perform these sex acts.

Victim testified at trial about the sexual abuse. The prosecution asked Victim what would happen in Simmons' room, and she responded, "He would make me rub his wiener," his "bad spot." She stated that this happened "every day and every night," and that, when she told Simmons that she did not want to do these things, he responded, "get over here or I'll give you the belt." Victim testified that, when Simmons gave her baths, he "would touch my bad spot."

Brother was seven years old when he spoke with the CAC interviewer. He stated that he slept at Simmons' house in an adjacent bedroom (which was supposed to be Victim's room), while Victim slept in Simmons' bed. Brother told the interviewer that, one night (not long before the interview) he was standing in the doorway of Simmons' bedroom and saw Simmons touch Victim's "bad spot" with his hand. Brother said that he told Father about this incident after Victim had been trying to kiss her male cousins. He also told the interviewer that he did not feel safe around Simmons, whom he described as "just mean." Video recordings of both children's interviews were played for the jury at trial.

Brother also testified at trial about seeing Simmons touch Victim's "bad spot," and he demonstrated Simmons' actions to the jury. Brother told the jury that he saw Simmons standing beside the bed where victim was sleeping and that Simmons pulled down Victim's pajama pants, touched her vaginal area over her underwear, and then went into the bathroom. Brother testified that Victim usually slept in Simmons' bed and that Simmons would carry Victim into his bed when she fell asleep elsewhere in the house.

Following the children's CAC interviews, the Sheriff's Department contacted Simmons. Simmons waived his *Miranda* rights and agreed to give a statement to law enforcement officers,

4

including Sergeant Kirkendoll. At the interview, Simmons acknowledged that he was "partial" to Victim and that she "oftentimes" slept in the same bed with him. Simmons admitted that Victim had complained to him when he accidentally touched her while giving her a bath, and she said "that was a bad spot, or not to touch her there." He claimed that it never happened again. Simmons told the officer that "he'd never known [Victim] to lie," but he denied the remainder of the alleged acts.

At trial, Simmons testified that he favored Victim over all of his 25 great-grandchildren. He said that he "took [her]" as his "pet" and "spoiled her rotten." Simmons also admitted that Victim slept in his bed. He stated that he only touched Victim's vagina by accident when drying her "sides" after a bath, and that, after Victim complained, he always let her dry herself. Simmons claimed to have been impotent for years, but he "[did]n't really remember" when he became impotent.[5] Simmons acknowledged that, in 1976 (when he was around thirty years old), he had been convicted of the statutory rape of a fourteen-year-old girl.

The defense theory at trial was that the parents had put Victim and Brother up to lying about Simmons to aid in their custody battle against Grandmother. Among Simmons' witnesses was a daughter (whom we refer to as "Aunt"), who testified that she had had three conversations with Father (her nephew) following Victim's disclosure of the abuse. Counsel then asked, "Could you tell the court the substance of those conversations?" The State objected on the basis that the question "calls for hearsay," and the court sustained the objection.

The jury found Simmons guilty, and the court sentenced him, as a prior offender, to twenty years' imprisonment.

---

[5]Simmons' doctor testified that Simmons did not discuss his impotence with her until March of 2014, when he asked for Viagra or Cialis (which she did not prescribe due to his other medications). She stated that she had only Simmons' word that he was impotent, and even if he was, it would not interfere with his ability to ejaculate. The doctor testified that Simmons declined her offer to refer him to a urologist.

## Discussion

Both of Simmons' points on appeal relate to the court's exclusion of Aunt's testimony about her conversations with Father regarding Victim's allegations. "A trial court has broad discretion to admit or exclude evidence," and we will reverse its decision only for a clear abuse of discretion. *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). A court abuses its discretion when its ruling "is clearly against the logic of the circumstances and so unreasonable as to indicate a lack of careful consideration." *Id.*

Simmons claims in ***Point I*** that the court erred in excluding Aunt's testimony under the rule to exclude witnesses from the courtroom ("the rule"), in that Father could have been recalled to rebut Aunt's statements. Simmons asserts that, although Father had remained in the courtroom after being excused as a witness, he was not "incompetent to testify" in rebuttal because, even if Father violated the rule, there was no "consent, connivance, or procurement of the party or counsel calling him."

Under the rule, a court may order witnesses excluded from the courtroom so that they will not be privy to the testimony of other witnesses. *State v. Clinch*, 335 S.W.3d 579, 589 (Mo. App. 2011). "The remedy . . . for violation of 'the rule' is to disqualify the offending witness from testifying." *Id.* Whether to exclude testimony because a witness violated the rule lies within the sound discretion of the circuit court. *Id.*

Here, the record shows that the court sustained the State's objection to this line of questioning on the basis that the testimony would be hearsay, not based on a violation of the rule. After defense counsel asked Aunt, "Could you tell the court the substance of those conversations [with Father]?" and the State objected on the basis of "hearsay," defense counsel responded only that "[Father] is available." The court ruled: "Counsel, I don't know. You're asking her to

testify what he said?  We'll pass on that.  ***I'm going to have to sustain the objection***, if that's what the question is . . . eliciting[.]"  (Emphasis added.)  After the court sustained the objection, defense counsel clarified that he was stating that Father was available, and the court stated: "Well, it is still the statement of a -- of a person who is not a party or victim in this proceeding that's ***apparently being offered for the truth of its contents, correct?***"  (Emphasis added.) Defense counsel did not reply to the court's inquiry but, instead, stated:  "Judge, if you're sustaining the state's objection -- [to which the court interjected, "I am"] -- we'll move on." Counsel stated that he had "nothing further for this witness," and Aunt was excused.

After Aunt stepped down, and after an unrelated bench conference about Simmons' prior rape conviction, defense counsel asked "to proffer what [Aunt's] testimony would be."  He stated that "she was going to testify that [Father] admitted to her that he was lying about [Victim's] allegations, made statements to that effect."  The court responded, "Well, I don't think that's the correct way to make a proffer of evidence, but you've made your record.  So we'll move on."[6]

Simmons is correct that a court should disqualify the offending witness from testifying only where "the witness violated the rule with 'the consent, connivance or procurement of the party or counsel calling him.'"  *Clinch*, 335 S.W.3d at 589.  It could be argued that such was the case here, given that defense counsel obviously knew he would be asking Aunt about Father's alleged statements and that Father remained in the courtroom.  We need not address that issue, however, because the record shows that the court never actually applied "the rule" to exclude Father's testimony, in that Simmons never attempted to re-call Father as a witness.

---

[6]"When a prospective witness is precluded from testifying, the proper procedure is for the person protesting such exclusion to preserve the anticipated evidence by an offer of proof in the form of questions and answers, or a summation by counsel of the proposed testimony[.]"  *State v. Woods*, 357 S.W.3d 249, 253 (Mo. App. 2012).  "The offer must be definite, specific, and demonstrate why the evidence is relevant and admissible.  Mere statements and conclusions of counsel are not sufficient."  *State v. Comte*, 141 S.W.3d 89, 93 (Mo. App. 2004).

Point I is denied.

Simmons contends in ***Point II*** that the circuit court erred in excluding Aunt's testimony on the basis that her statements would be hearsay. He argues that the proposed testimony was not hearsay but was admissible to impeach Father's credibility, in that Father had testified that Victim voluntarily disclosed her allegations of abuse to him, but Aunt would testify "that Father had told her [that Victim] had not done so and, instead, that the allegations came from Mother."

"A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends upon the veracity of the statement for its value." *State v. Winfrey*, 337 S.W.3d 1, 6 (Mo. banc 2011). "Such statements are generally inadmissible unless they fall within a recognized exception to the hearsay rule." *Id*. A statement is not hearsay when it is offered ***not*** to prove the truth of the matter asserted, but for some other purpose that does not require a belief in its truthfulness, such as impeachment. *See id*. at 6-7. Here, Simmons argues that Aunt's proposed testimony was not hearsay because it was being offered to show that Father made a statement to Aunt that was "inconsistent with [his] testimony" and, thus, was admissible as impeachment, in that it had a "legitimate tendency to throw light on [Father's] 'accuracy, truthfulness, and sincerity.'" *See State v. Hahn*, 37 S.W.3d 344, 355 (Mo. App. 2000).

The problem with this argument is that no foundation was laid for impeachment of Father with a prior inconsistent statement. "A witness may be impeached by extrinsic proof of a prior inconsistent statement as to material matters" provided that a proper foundation has been laid. *Aliff v. Cody*, 26 S.W.3d 309, 318 (Mo. App. 2000). A proper foundation requires that Father be confronted with the alleged statements during his examination. *See id*. at 317-18. "In laying the proper foundation, it is necessary to ask the witness whether he or she made the statement, quote the statement, and point out the precise circumstances under which it was allegedly made,

8

including to whom the witness spoke and the time and place of the statement." *Id.* at 318. If Father admits that he made the statement, then that concludes the matter; if Father denies or equivocates, then Aunt may testify concerning the statement she attributes to Father. *See State v. Wilson*, 105 S.W.3d 576, 585 (Mo. App. 2003). The exclusion of testimony that is intended solely for impeachment purposes is "not fundamentally unfair" if the appellant had the opportunity to thoroughly cross-examine the witness whose testimony was to be impeached. *See State v. Woods*, 357 S.W.3d 249, 254 (Mo. App. 2012). Here, Father was cross-examined by Simmons' defense counsel but was not asked about his alleged statements to Aunt. Consequently, no impeachment by prior inconsistent statement was permissible. Moreover, Father was excused by the court after his testimony, and, as noted *supra*, no one sought to recall him to lay the proper foundation.

In addition, Simmons did not raise impeachment at trial as a basis for admitting Aunt's testimony.[7] Defense counsel's only response to the State's hearsay objection was that "[Father] is available." Simmons did not claim at any time prior to the court's final ruling on that objection that he was offering the testimony for impeachment purposes. Furthermore, Simmons' proffer at trial as to what Aunt would have said is different from what Simmons claims on appeal that she would have said, *i.e.*, that Father stated Victim "had not [disclosed her allegations to him] and, instead, the allegations *came from* Mother."[8] "An argument is not properly preserved for appeal when the Appellant fails to argue at trial the grounds asserted upon appeal." *State v. Dismang*,

---

[7]Simmons also has not claimed, at trial or on appeal, that the evidence was admissible under section 491.074, under which "a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence." Offering a prior inconsistent statement only to impeach a witness does not preserve a claim that the statement was admissible as substantive evidence under that statute. *See State v. Proudie*, 493 S.W.3d 6, 12 (Mo. App. 2016).

[8]This language appears to be derived from Aunt's affidavit (which was submitted post trial as an attachment to Simmons' new trial motion), in which she claims, *inter alia*, that Father told her "that he had nothing to do with the allegations of abuse and that they had come from [Mother]."

9

151 S.W.3d 155, 162 (Mo. App. 2004). "An appellant cannot broaden or change allegations of error on appeal." *Id*. Simmons attempts to do just that; thus, this claim is not preserved and is subject to review for plain error only. *See id*.

Rule 30.20 authorizes this Court to review, in its discretion, "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995) (quoting Rule 30.20). If not, we should not exercise our discretion to conduct a Rule 30.20 plain error review. *Id*. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. *State v. Baumruk,* 280 S.W.3d 600, 607 (Mo. banc 2009). "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear." *Id.* In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.*

"Manifest injustice is determined by the facts and circumstances of the case, and the defendant bears the burden of establishing manifest injustice." *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006). Here, Simmons fails to show that his claim meets the initial threshold test. It does not facially establish substantial grounds for believing that he has suffered a manifest injustice; thus, we need not proceed with any Rule 30.20 plain error review.

Point II is denied.

## Conclusion

The circuit court did not sustain the State's objection to Aunt's testimony based on the rule to exclude witnesses, and Simmons failed to lay a proper foundation for his claim that the testimony was admissible for impeachment purposes. Thus, we affirm the circuit court's judgment.

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.

11