

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
                      )
    Plaintiff-Respondent, )
                      )
vs. )      No. SD36565
                      )
RODNEY BENSON BOWEN, )      **Filed:  March 31, 2021**
                      )
    Defendant-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF STODDARD COUNTY

Honorable Robert N. Mayer, Circuit Judge

**<u>AFFIRMED</u>**

A jury found Rodney Benson Bowen ("Defendant") guilty of robbery in the first degree; the trial court sentenced Defendant to imprisonment for twenty-five years. Defendant appeals claiming in two points that the trial court erred in admitting evidence of Defendant's drug use and addiction, and evidence of threats made against Defendant's fiancée, her family and home by a person who Defendant owed money as being probative of Defendant's motive for committing the robbery. We reject both of Defendant's points, and affirm the trial court's judgment.

**Standard of Review**

We review a trial court's decision to admit evidence as follows:

> A trial court has broad discretion to admit or exclude evidence at trial. This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. [T]hat discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Additionally, on direct appeal, this Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.

*State v. Forrest*, 183 S.W.3d 218, 223-24 (Mo. banc 2006) (internal footnotes and quotation marks omitted).

**Procedural Background**

In a pretrial, case review conference on November 20, 2019, the prosecutor told the trial court that he "anticipate[d] . . . an issue with regard to some prior bad acts that will be offered for the purpose of providing motive for the crime." Then, in a subsequent pretrial conference on December 4, 2019, the prosecutor objected to a portion of a motion in limine filed by Defendant and informed the trial court he anticipated presenting evidence of "uncharged acts of misconduct" that included "Defendant's addiction to crack cocaine," Defendant's "financial state around the time of the armed robbery," and "the fact that [Defendant] has basically people coming to his house, threatening harm to him if he didn't pay his drug debts" as "evidence [of] motive for the crime." Following an offer of proof at trial, the trial court implicitly denied in part the objected to portion of the motion in limine as to the testimony of Defendant's fiancée, Angela Diamond. The court indicated it "believe[d] the testimony of Ms. Diamond will show that [Defendant] had some degree of an addiction problem to drugs and I believe that will help show that

2

he had a motive to commit the crime." Subsequently, during a witness' testimony at trial, Defendant was granted a continuing objection "to any line of questioning as to motive involving financial motive or drug problems" based on relevance and hearsay.

**Facts[1]**

Around 9:00 p.m. on February 24, 2019, a lone female employee of a "gas mart" in Dexter was robbed by a lone male. The robber was wearing a mask that concealed his face except for his eyes and the skin around his eyes, and had what appeared to the employee to be a black pistol. The mask appeared to be a "darker" "blue." The robber's "hands [were] covered," and the employee "want[ed] to say it was gloves but I can't be positively sure." From the exposed skin around the robber's eyes, the employee believed the robber was "black." The robber also was wearing a baseball cap, "hoodie," and a coat. The employee "want[ed] to say there was some plaid in [the coat], brownish plaid." The robber pointed the handgun at the employee and told her to "hurry up." The robber took all the currency in and under the cash register drawer except for a portion of the one-dollar bills (52 one-dollar bills were taken in the robbery in two bundles each clipped together with a paper clip – 27 in one bundle and 25 in the other bundle). In the aggregate, between "$700 and $1200" was taken in the robbery. The employee lost sight of the robber shortly after he left the gas mart building.

A woman and her husband were driving by the gas mart around 8:45 p.m. The woman was driving, and observed a "man standing on the side of the road kind of in the shadows." The woman continued to watch in her rearview mirror, and observed the man contact a woman outside the gas mart and then go inside the gas mart with the woman.

---

[1] We review the evidence in the light most favorable to the jury's verdict, *State v. Winfrey*, 337 S.W.3d 1, 3 (Mo. banc 2011), though we include some contrary evidence here in order to give context to Defendant's arguments.

The man "looked like he was wearing dark clothing, like a jacket with a hood and just dark pants." The man might have been wearing a "dark plaid jacket." "[B]ecause it seemed really odd," the woman turned around and returned to the gas mart. On returning to the gas mart, the woman observed the man walking away from the gas mart with a "very significant limp" and "then run into the park."

A Dexter police officer testified as follows. At 8:48 p.m. on February 24, 2019, the officer received a "message from dispatch about an armed robbery" at the gas mart. The robber was described as a "black male" "who had displayed a handgun . . . and fled on foot toward the West City Park." The officer "went directly to the West City Park," but was not "immediately able to find anybody that matched the description." The officer left the park to search surrounding neighborhoods, but returned to the park when he was informed that an individual was seen "hiding behind the back of the park bathrooms," and began a "foot search of the area behind the bathrooms." In the course of the search, the officer found (1) "a black ski mask that was laying beneath a bush at the back side of the bathrooms" (the bush was located "[j]ust to the northwest" of a cell phone tower in the park); and (2) a ball cap, a beer can and "tire tracks" "near the soda machine" at the bathrooms (the tire tracks were made by "very narrow" tires "probably within a foot or two of each other").

"[N]eighbors across the street from the park bathrooms" told the officer they had observed, and had "video" of, an individual "getting up" from a wheelchair in front of the park bathrooms and "fleeing." The officer turned around and observed a wheelchair in front of the bathrooms. The ground was "very muddy." The wheelchair appeared to have left the side walk and "got hung up" in the mud. Later, the officer observed a

4

"bundle of money" and a "charger" for the wheelchair near the wheelchair. The video was played for the jury, and showed that the officer initially passed the individual in the wheelchair in the park when the officer first responded to the park. After the officer passed, the video showed a man running toward the back of the park bathrooms.

The park bathrooms are "two to three hundred yards" from the gas mart. The officer located the ski mask at or before 8:55 p.m.

A detective for the Dexter police department testified that the money found near the wheelchair was 27 one-dollar bills clipped together with a paper clip.[2] The detective also located a "black BB gun pistol behind the soda machines" at the park bathrooms, and identified the beer can found near the park bathrooms as an "Icehouse beer can." On the wheelchair at the park, the detective found a "brown pair of boots, a brown Carhartt coat and . . . a white plastic bag containing a blue long sleeved shirt as well." The boots were muddy. The tire tracks near the park bathrooms "appear[ed] to be similar width to" the wheelchair's tires.

"[A]pproximately an hour after the initial 911 call," Defendant was located near where he lived walking with Cydney Kelley, a roommate. Both Defendant and Ms. Kelley were taken into custody. In a straight line, the home where Defendant was living was 1,066 yards from the gas mart. The home was about "eight minutes at a normal walk" from the park bathrooms. Defendant lived there with his fiancée Angela Diamond, Jaison Carwile, and Ms. Kelley and her baby. The detective observed multiple "empty Icehouse beer cans that were laying next to" a metal shed at the home. The cans "appear[ed] to be the same brand and same kind of can" as the Icehouse beer can found near the park bathrooms.

---

[2] This was the only money recovered by law enforcement.

5

In an interview with the detective in the early morning hours on February 25, Defendant told the detective he received "money" from his sister by wire transfer at Walmart in the early afternoon on February 24, 2019.  Defendant also told the detective he "used the wheelchair"[3] to go to another store on February 24 where he purchased four cans of Icehouse beer.  In-store video of that transaction showed Defendant dressed in "dark colored pants" and a "brown coat," and a time of 4:41 p.m.  Defendant told the detective that Defendant "used [the wheelchair] on occasion because he had a bad hip." According to Defendant, after returning home, he decided to return to the store and "noticed the wheelchair had been stolen."  Though Defendant told the detective that he asked Ms. Diamond to call the police and report the theft, no theft was reported. Defendant also told the detective that he then left the house to look for the wheelchair, and found the wheelchair in West City Park but again did not report finding the wheelchair to police.  When found by police while walking with Ms. Kelley, Defendant was wearing a different jacket and pants than he was wearing earlier that day when he purchased beer.  Defendant admitted the "brown coat" and "muddy shoes" found on the wheelchair at the park were his.  Defendant also admitted the Icehouse beer cans found next to the metal shed at his house were "his beer cans."  Defendant was cooperative during the interview.

The next day after the robbery, another officer found a "pair of black jersey gloves" in the parking lot of a bank that was located "across the street" from the gas mart, and between the gas mart and West City Park (the gloves were "approximately 175 yards" from the gas mart, and "approximately 156 yards" from the park bathrooms).

---

[3] The inference from Defendant's statements during the interview is that when Defendant referred to "the wheelchair" in the interview, he was referring to the wheelchair found by law enforcement in front of the park bathrooms and that was normally kept at his fiancée's home where Defendant was living.

A DNA analyst with the Missouri State Highway Patrol Crime Laboratory testified as follows. "[A] single source [DNA] profile" was found on the "mouth area" of the "Icehouse beer can" found near the park bathrooms. The DNA "match[ed]" Defendant's DNA. A DNA "mixture profile of two people" was found on the "pair of black gloves" found between the gas mart and the park – on the inside of each glove. Defendant's DNA "match[ed]" the DNA of the person who contributed a majority of the DNA to the mixture profile. A DNA mixture of multiple people was found on the "black ski mask" found near the park bathrooms. Defendant's DNA "match[ed]" the DNA of the person who contributed a majority of the DNA to the mixture. DNA also was found on the "BB pistol" found at the park bathrooms, but the DNA of the major contributor did not match Defendant's DNA, and the source or sources of the remaining DNA could not be determined.

According to Mr. Carwile, "two or three days before" the robbery, Defendant asked Mr. Carwile "do you want a chance to make some money? And I said yes. I love the chances to make money. Just, what's the catch? He said, well, robbery." Defendant proposed "rob[bing] a small town store like On The Go, Dollar General or Country Mart or something and when we robbed the store we would take the money, go put it somewhere for a good amount of time so when if we did get caught we got out and we could still have the money." Mr. Carwile "told [Defendant] no." Defendant drank Icehouse beer. "[D]uring the day" on February 24, Mr. Carwile's memory was that Defendant was wearing "brown lace-up boots which were muddy, a big brown heavy jacket and an unknown colored hoodie under the jacket, a hat, a pair of black jeans [Mr. Carwile] described as blackout jeans, and a pair of thick black jersey type gloves."

According to Ms. Diamond, Defendant left the house after dark on February 24 "to get something to drink." Ms. Diamond did not see Defendant again on February 24.

In the weeks before February 24, "money [was] extremely tight." Though Ms. Diamond was employed at a Dollar General store, by sometime in December 2018, Ms. Diamond lost her income that she earned from taking care of the elderly co-owner of her home when the co-owner developed gangrene and went to first the hospital and then the nursing home. The wheelchair at Ms. Diamond's home belonged to the co-owner. At the time of the robbery, Ms. Diamond was the only employed adult living at her home

Defendant "struggle[d]" with "[c]rack," and relapsed at the end of 2018 or beginning of 2019. The most Defendant spent in a week on crack was $250 to $300 – which was a "full paycheck." "[S]ometimes it was a lot less." "[T]owards the beginning of February," "[i]t was starting to get hard" to pay household bills, and Ms. Diamond "basically cut [Defendant] off" and told him he "wouldn't be using [her] paycheck to" "purchase crack." Defendant also would "take" Ms. Diamond's "debit card." A "couple weeks" later and "about a week or so before February 24," a person came to Ms. Diamond's home that Defendant told her he "owed . . . money," and was "there to get money." Over hearsay and relevance objections, Ms. Diamond testified that "when I walked outside, I asked what was going on and everything and the guy basically looked at me and told me that I need to get my MF'ing self back in the house. And I told him that this was my house, not [Defendant's], and I wanted him off of my property or I was going to call the police. And [Defendant] told me to just calm down, that he would take care of it, let him deal with it." Ms. Diamond viewed the person as "threatening," and added that the person "threatened to blow my house up" and made "threats of violence"

8

against her.  Ms. Diamond also heard that "[she,] [her] family and everybody" in her house "was going to die."

Defendant has "mobility problems" and, when Defendant's "hips start[] hurting," Defendant "starts limping really bad."  Defendant "would have a noticeable limp when he runs."  Defendant has walked from Ms. Diamond's "house to work and that would be about two and a half miles, if that."

**Analysis**

In his first point, Defendant asserts that the trial court "abused its discretion" in admitting "testimony about" Defendant's "alleged drug use, drug addiction, and drug-related debt" because that testimony was not "legally relevant," and prejudiced Defendant.[4]  In his second point, Defendant contends that the trial court "abused its discretion" in admitting "evidence about a man allegedly coming to [Defendant's] residence to demand money" because that evidence was not "legally relevant," was inadmissible "hearsay" and prejudiced Defendant.  Because the facts and legal principles that underlie both points are similar, we address both points together.

*General Legal Principles*

Generally, evidence of prior bad acts is inadmissible to show the propensity of the defendant to commit the crime for which he is charged. *State v. Fassero*, 256 S.W.3d 109, 118 (Mo. banc 2008).  However, evidence of such misconduct is admissible "to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the alleged perpetrator." *State v. Davis*, 211 S.W.3d 86, 88 (Mo. banc 2006).  The offered evidence must be both logically relevant, in that it has some legitimate tendency to establish the guilt of the accused for the

---

[4] As Defendant acknowledges in his brief, the evidence before the jury was that, "about a week or so" before the robbery, a person came to Ms. Diamond's home that Defendant told Ms. Diamond he "owed . . . money" and was "there to get money."  Although Ms. Diamond testified that she "assum[ed]" the debt was "a drug debt," counsel for Defendant promptly objected and the trial court sustained the objection, and directed that Ms. Diamond's answer be stricken from the record and that the jurors disregard the answer.  As a result, no testimony describing what the debt was for, or describing the debt as "drug related," was before the jury for its consideration.

9

charges for which he is on trial, and also legally relevant, in that its probative value outweighs its prejudicial effect. *State v. Mayes*, 63 S.W.3d 615, 629 (Mo. banc 2001).

*Winfrey*, 337 S.W.3d at 11. In addition, "[l]egal relevance concerns whether the 'probative value of the evidence outweighs unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.' *State v. Wood*, 580 S.W.3d 566, 575 (Mo. banc 2019) (citation omitted)." **State v. Carpenter**, 605 S.W.3d 355, 364 n.6 (Mo. banc 2020). Further, "[w]ide latitude is given in the development of motive," **State v. Young**, 582 S.W.3d 84, 92 (Mo.App. E.D. 2019), and uncharged drug use is relevant to show motive for a subsequent robbery. **State v. Oplinger**, 193 S.W.3d 766, 771 (Mo.App. S.D. 2006).

*Discussion*

In this case, Ms. Diamond's testimony that (1) Defendant was unemployed, (2) Defendant "struggled" with "crack," (3) the most Defendant spent in a week on crack was $250 to $300 -- a "full paycheck," (4) "towards the beginning of February" 2019, "[i]t was starting to get hard" to pay household bills, and Ms. Diamond "basically cut [Defendant] off" and told him he "wouldn't be using [her] paycheck to" "purchase crack," and (5), "about a week or so" before the robbery, a person, who Defendant told Ms. Diamond he owed money and who was "there to get money," came to her home and told her to "get my MF'ing self back in the house," and threatened the safety of her family and home was highly probative of the fact that Defendant was in serious financial difficulty and had a strong motive to rob the gas mart to resolve his financial difficulty.

10

The testimony dovetails with Mr. Carwile's testimony that Defendant was contemplating robbery as a means to make "some money."[5]

We find no error in the admission of evidence that established Defendant's motive to rob the gas mart.[6]

Defendant's points I and II are denied, and the trial court's judgment is affirmed.


Nancy Steffen Rahmeyer, P.J. – Opinion Author

William W. Francis, Jr., J. – Concurs

Jack A. L. Goodman, J. – Concurs

---

[5] Defendant also contends in his brief that the statements by the person he owed money were inadmissible hearsay. Defendant did not raise this objection in his motion for new trial with the result that he failed to preserve this objection for review on appeal, *State v. Nichols*, No. SD 36704, 2021 WL 1035078, at *2 (Mo.App. S.D. Mar. 18, 2021), and does not request review for plain error.

[6] Additionally, given the strength of the case, there is no reasonable probability that the outcome was affected by the admission of the evidence.